WILLIAM BUCKLES, C. C. IRVINE AND R. L. REEDY,
PARTNERS UNDER THE FIRM NAME AND STYLE OF
BUCKLES, IRVINE COAL COMPANY v. KENNEDY
COAL CORPORATION.        No. 1.

*and*

SAME v. SAME.        No. 2.

September 21, 1922.

Absent, Kelly, P.

1. EASEMENTS—*Right of Way of Mining Railroad—Parol Grant of Right of Way Becoming Irrevocable by Part Performance—Case at Bar.*—In a suit by the owners of the surface to enjoin the operation and change of construction of a mining railway upon or across their lands, the preponderance of the evidence clearly establish that there were parol grants to the mining company, from the former owners of the surface of the land affected, of the rights of way in question, which grants were so far executed, prior to suit, by part performance on the part of the mining company, that it would be inequitable to rescind them.
   *Held:* That the grants would be upheld in equity as irrevocable, on the same principle that a partly performed parol contract for the sale of land would be upheld.

2. EASEMENTS—*License, Real Property—Frauds, Statute of—Parol Grants Partly Performed—Rights of Way.*—Notwithstanding that the grant of an easement is embraced within the statute of frauds, and therefore must be in writing, yet it is held that a parol grant of an easement executed will be upheld and sustained under the same circumstances and on the same principle that a parol contract for the sale of land would be. Whether the doctrine is applicable to a mere license, so that an easement may be created thereby, has been the subject of an irreconcilable division of opinion among the American authorities.

1

3. EASEMENTS—*License, Real Property—Parol Grants Partly Performed—Equitable Easement.*—Although the line of distinction between an easement and a license is often obscure, if a transaction be one which, if it were under seal, would create an easement, it being classed as a license merely because it is oral, upon a part performance by the licensee by the expenditure of money, or otherwise, a court of equity may regard it as an equitable easement, and therefore irrevocable.

4. EASEMENTS—*License, Real Property—Parol Grants Partly Performed—Equitable Easement.*—Where the grant, consent, or license in question consists not merely in the permission given one to do something on his own land which injuriously affects, or puts a burden upon the land of the person giving the permission, but consists of the right to build and use, for a definite purpose, some structure on the land of the latter, and where the structure is accordingly built by the former, at large outlay of expense, which would not have been made but for the permission having been given, the right is held to be a contract right acquired by purchase for valuable consideration, which, indeed, does not rest entirely in parol, and which is coupled with an interest, creating an interest in the land, and which in equity at least is tantamount to, if not technically, an easement.

5. EASEMENTS—*Right of Way of Mining Railroad—Parol Grant of Right of Way Becoming Irrevocable by Part Performance—Evidence Sufficient to Establish Parol Grant—Case at Bar.*—In a suit by the owners of the surface to enjoin the operation and change of construction of a mining railway upon or across their lands, the internal evidence furnished by the manner in which the testimony of the respective witnesses was given, and the inferences to be drawn from the uncontroverted facts and from the testimony itself, satisfied the court that the existence of the parol grants of the rights of way in question from the predecessors of the complainants to the defendant was as clearly established by the preponderance of the evidence as a parol contract of sale of land is required to be established.

6. EASEMENTS—*Mining Railway Right of Way—Dimensions of Right of Way.*—Grants of right of way for a mining railroad in the first instance authorized the construction and operation of a standard gauge railroad, but the grantee was temporarily prevented from establishing such standard gauge by the intervention of the Government. The grantee thereupon constructed a narrow gauge road and the land-owners acquiesced therein. When the Government released the control of the railroads the grantee began the conversion of the narrow gauge into a standard gauge railroad.

*Held:* That the grants of right of way were sufficiently definite, with respect to the width of the right of way, to authorize the grantee to first construct and operate a narrow gauge and subsequently a standard gauge railroad.

7. EASEMENTS—*Right of Way of Mining Railroad—Parol Grant of Right of Way Becoming Irrevocable by Part Performance—Notice of Easements.*

—In a suit by the owners of the surface to enjoin the operation and change of construction of a mining railway upon or across their lands, the owners were held to have notice of the mining company's easements over the lands affected when such lands were purchased by them.

8.  EASEMENTS—*License, Real Property—Parol Grants Partly Performed— Purchasers for Value Without Notice.*—The doctrine that a parol grant of an easement may become irrevocable by part performance is not applicable as against purchasers for value without notice of the easement.

9.  EASEMENTS—*Purchasers for Value—Notice of Existence of Easement— Partners.*—Where a partnership acquires land, they are affected with the same notice which a member of the partnership, the former owner of the land, had of the existence of an easement thereon.

Appeal from a decree of the Circuit Court of Russell county.  Decree for defendant.  Complainants appeal.

*Affirmed.*

These causes are suits in equity instituted by the appellants praying that the appellee, a corporation, engaged in coal mining and in operating a private railroad to and from its coal lands (which at the time cause No. 1 was instituted was a narrow gauge railroad and at the time cause No. 2 was instituted was being changed in construction into a standard gauge railroad, and which is located upon and across two separate parcels of land, one of nineteen acres and the other of three and one-half acres, the surface of which belongs to appellants), may be enjoined and restrained from the operation and change of construction of such railroad upon or across the lands of appellants.

The appellee claims to have acquired, from the former owner of the surface of the three and one-half acre tract and from the appellant, R. L. Reedy, as the former owner of the surface of the nineteen acre tract prior to the acquisition of that tract by the partnership of appellants, the right to construct and operate said railroad as

the appellee first constructed it and as it was proceeding to enlarge it as aforesaid, by parol contracts with such former owners, of which, as appellee claims, the appellants had full notice, actual or constructive, before appellants acquired such lands, which contracts have been so far partly performed on the part of the appellee, as it claims, that in a court of equity the appellee will be regarded as having acquired such rights as easements over the said lands of appellants.

The decrees under review refused the injunctions prayed for and dismissed the respective suits, thereby sustaining the aforesaid positions taken by the appellee.

The testimony, bearing upon the question of whether there were definite parol contracts entered into between the appellee and the said former owners of said lands, which gave the appellee the aforesaid rights of easement, is voluminous and conflicting. On the subject of the notice aforesaid to appellants of the existence of such contracts before appellants became the purchasers of said lands, there is practically no conflict in the testimony. It is uncontroverted that appellants had actual knowledge of the construction and operation of the railroad upon and across said lands from the beginning of such uses of the easements. Moreover it appears from the testimony for appellants that, before the partnership of appellants acquired said lands, the appellants had full, actual or constructive, notice of such contracts.

The following facts appear from the evidence, practically without conflict in the testimony:

The coal lands of the appellee consist of some 7,000 acres of coal, with certain mining rights, on the waters of Sword's creek, in Russell county, the nearest outside boundary line of such coal lands being about two miles from the Clinch Valley Division of the Norfolk and Western Railway. It was decided that the coal opera-

tion would be installed, beginning at a tipple to be located about one and a half miles within the last named boundary line and that much farther up Sword's creek, making the railroad about three and one-half miles in length. For the first two miles it was decided that the appellee would procure conveyances in fee of the rights of way; but the Clinch Valley Coal and Iron Company, the then owner of the said 7,000 acres of land, owned the coal under all of the other lands over which the railroad would pass, including said nineteen and three and one-half acre tracts, and also owned certain mining rights over the surface of such lands; but it was not known by said promoters and officers at the time just what the latter rights were, so that they decided that, regardless of what the latter rights were, they would pay the owners of the surface actual damages caused by the construction of the railroad over such land, provided the owners would consent to the construction and operation of the road for the purpose aforesaid.

The said former owner of said 7,000 acres of coal lands, the Clinch Valley Coal and Iron Company, had held them for many years undeveloped. A railroad, connecting the proposed location of the coal tipple aforesaid with the Norfolk and Western Railway, was essential to the development of such coal lands and the route up Sword's creek was the only practical route for the railroad. Prior to appellee's purchase of such lands, its promoters and subsequent officers, in February, 1917, obtained from the Clinch Valley Coal and Iron Company a ninety-day option to purchase same at the price of $245,000.00, and decided to make the purchase if the rights of way for a standard gauge railroad could be secured from the landowners along the aforesaid route, so that the properties could be developed and the coal marketed. Being a private company, the appellee,

when incorporated, would, as the parties knew, have no right of condemnation of the right of way, but would be dependent upon acquiring such right of way by contract with the respective surface landowners affected. Thereupon, during the ninety-day option, the promoters and officers aforesaid had a survey made for the location of the railroad along the aforesaid route and arranged and held a public meeting and, subsequently, interviewed, or had agents interview, the surface landowners along the aforesaid one and a half miles end of the route, on the subject of obtaining from them permission to construct and operate such railroad for the purpose of developing and operating the said coal lands and marketing the coal therefrom. The landowners affected were found to be unanimously favorable to this development, being interested in many obvious ways. None of the fee simple rights of way on the two miles of the railroad aforesaid, before it reaches the outside boundary line aforesaid, however, is involved in these causes.

The purpose of the appellee to construct and operate a standard gauge railroad over said route and that appellee would pay for the right to construct and operate the same for the purpose aforesaid over the one and a half miles of it from the said outside boundary line of the coal lands aforesaid to the proposed location of the coal tipple, whatever actual damages were occasioned by the construction, provided the owners of the surface of the lands over which that part of the road was to pass would consent to such construction and operation, was announced by appellee to and well understood by such owners.

Just here comes the conflict in the testimony on the subject of whether the then owners of the surface of said two pieces of land subsequently acquired by the part-

nership of appellants, gave such consent.  R. L. Reedy, one of appellants was, as aforesaid, then the owner of the surface of said nineteen acre tract, and one Mrs. Julia Vance was then the owner of the surface of said three and one-half acre tract.  The witnesses for appellee testify positively and circumstantially that both Reedy and Mrs. Vance gave the aforesaid consent, verbally, to which there was no limitation or condition attached, except the promise aforesaid made for appellee that it would pay whatever actual damages were occasioned the said Reedy and Mrs. Vance, respectively, by the construction of the railroad over their respective lands aforesaid.  These witnesses further testify, in substance, that subsequently to the first giving of his consent, Reedy saw the president of the appellee company and stated to him that all the damages he (Reedy) wanted for the railroad over the said nineteen acres of land was for the appellee company to agree to haul the coal from a certain other nine acre tract of coal land owned by Reedy, when the railroad was in operation; and that the president, acting for appellee, agreed to this and further agreed with Reedy, how it would be hauled and how the price therefor was to be determined, and gave instructions to the manager of the appellee company accordingly, and that the company has been ready and willing, ever since the railroad was put in operation, to carry out that agreement.  Reedy and Mrs. Vance, however, testifying as witnesses for appellants, deny that they ever gave the aforesaid consent. The appellants also introduced in evidence the testimony of other witnesses tending to show that the appellee did not obtain such consent from all of the other owners of interests in the surface of some of the other parcels of land over which the aforesaid one and one-half miles end of the railroad runs next to the mine tipple aforesaid.

The appellee had an agreement with the Norfolk and Western Railway Company for a connection at Sword's creek of a standard gauge railroad; but before the appellee could construct such railroad the United States Government took over the railroads and refused to allow the appellee to build a standard gauge railroad. Hence, at that time, only a narrow gauge road could be built on said route. For this reason the appellee first constructed and put in operation a narrow gauge railroad along such route.

The evidence shows, without conflict, that appellee certainly reached the *bona fide* conclusion that it had obtained from Reedy and Mrs. Vance, and from all the surface owners of land along the said one and a half miles end of the route aforesaid, the consent aforesaid. Thereupon the appellee decided to purchase and did purchase the said 7,000 acres of coal properties, making a large outlay of money therefor, and proceeded to construct and did construct by a further large outlay of money, the said railroad, making it, in the first instance, a narrow gauge road, for the reason aforesaid—the narrow gauge feature of it being but a temporary one, the appellee intending to convert it into a standard gauge road as soon as the Government should release control of the railroads and the Norfolk and Western Railway Company was placed in a position to carry out the agreement aforesaid which it had made with appellee. Prior to the institution of the above entitled cause No. 2 the Government released its control of the railroads and the appellee obtained permission from the Norfolk and Western Railway Company for the connection of a standard gauge railroad from said mine tipple, as per said agreement between appellee and such railway company, and thereupon the appellee began the conversion of its railroad into a standard gauge road, which was sought to be enjoined by said suit No. 2.

We do not find it definitely stated in the record as of what date the narrow gauge railroad was completed. The reply brief for appellants states that it was completed in 1918. The appellee on June 14, 1919, paid Mrs. Vance $30.00 as the actual damages occasioned her by the construction of the railroad.   It was paid her by check, on which there was the following notation—"To cover damages in R. R. Constr."   The check was accepted, and endorsed by Mrs. Vance, and negotiated by her, and it was afterwards paid by appellee.   This payment was precisely in accordance with the contract on the subject of the right of way as the testimony for appellee tends to prove that contract.

There is an affidavit of Mrs. Vance, filed in evidence, in which she makes the statement that she accepted that sum as covering the actual damages occasioned her by the construction of the railroad because the general manager of the appellee company, prior to the construction of the road over her land, came to see her when she was living in her dwelling house located by the side of the railroad as it was subsequently constructed, and told her that he had the right to build the railroad over her land without paying her any damages, but that while the work was being done he agreed to pay her for the damages done to her crop of corn and cane; but that there was never anything said to her by anyone at any time about paying her for the right of way.   The deposition of Mrs. Vance, in evidence, is to the same effect. The record, however, shows that it appeared from her chain of title that appellee had no right of way over her land for the aforesaid purpose, unless acquired by agreement with her, and it does not appear that she ever in any way made any claim upon the appellee for any other damages or that she ever forbid, or objected to, the construction or operation of the railroad upon and

over the said three and a half acre tract of land for the said purpose. Moreover, Mrs. Vance, as she testifies, sold the three and a half acre surface of land, through which the railroad passes, to appellants, after the narrow gauge road was built and was in operation. Her deed to appellants bears date August 10, 1920. And she says in her deposition, that neither when she made this sale nor at any other time, was she asked by any of appellants whether the appellee had acquired the right of way across this land, that the subject was never mentioned by her or by the purchasers.

Reedy testifies in chief that he was never even asked to give his consent to the construction and operation of the railroad until after the narrow gauge road had been completed and was in operation. He says that the appellee claimed at the time the narrow gauge road was constructed that it had acquired the right to construct and operate the aforesaid one and a half miles end of it from the Clinch Valley Coal and Iron Company, and that he (Reedy) relied on that claim as being correct, until about a year after the narrow gauge road was completed, when he and some other parties were talking over matters upon the creek and they went to the clerk's office and found out what rights they thought appellee had—meaning that they found out from the clerk's office that appellee had no right of way such as appellee claims, over the nineteen and three and a half acre tracts aforesaid, appearing of record. The bill in cause No. 1 was filed August 18, 1920. So that Reedy admits, in effect, that he had learned from the clerk's office prior to the taking by appellants of the deed from Mrs. Vance, of date August 10, 1920, as aforesaid, that appellee had acquired no right of way over the three and a half acre tract of land unless under parol contract with Mrs. Vance and yet Reedy does not claim in

his testimony that he ever made any enquiry on the subject before taking the deed from her to the partnership, although, as he also admits in his testimony, the $250.00 (all of the purchase money therefor except $5.00) was not paid until the deed was made.

The consideration of the testimony of Reedy and Mrs. Vance, in the light of all the circumstances disclosed in evidence, creates upon the mind a strong impression that the parol contract with Mrs. Vance claimed by appellee existed and that Reedy and the other appellants well knew this long before suit No. 1 was instituted.

Moreover, the testimony for appellee is to the effect that Reedy volunteered to and did zealously assist in getting the consent aforesaid for appellee of other surface land owners on the said one and a half mile end of the route.   This Reedy denies, but, on cross-examination, he admits that in one *i*nstance he acted as agent for appellee in trying to get a portion of the right of way for appellee.   He also admits that C. W. Boyd, who was afterwards the president of the appellee company, on an occasion when a third person was present, who was a witness for appellee, before such company was organized or it had bought the 7,000 acre coal properties aforesaid, told him (Reedy) that the promoters of the appellee company "wanted to develop their coal holdings on the creek and would have to put in a railroad and that the railroad would have to go over (Reedy) a piece, and it made no difference what rights they had they wanted to go up there and did not want any friction and get into law suits;" and that Reedy replied that, "When he (Boyd) got ready to put a railroad through his (Reedy's) land, to come right on;" and that he (Reedy) told Boyd, on this occasion that he (Reedy) "wanted the coal hauled off his coal

land and wanted the railroad put up there for development;" and Reedy, after first saying that Mr. Boyd and his associates claimed "all the time" that they had acquired the rights of way in question from the Clinch Valley Coal and Iron Company, when asked if Boyd made the claim on that occasion (when the witness for appellee just referred to was present), first said that "I don't remember," then that "I don't know that he did." The third person present on the occasion just referred to, when put on the witness stand corroborated the testimony of Boyd for appellee, to the effect that Reedy on that occasion added to the statement, which he admitted, the further statement, to the effect that all the consideration he wanted for his consent to the construction and operation of the railroad by appellee was to have the coal hauled from his nine acre tract.

Further: Reedy also admits that the general manager of the appellee showed him where to put his tipple so that the appellee could haul the coal from Reedy's nine acre tract, but he doesn't remember whether the general manager told him that Mr. Boyd had instructed him to haul the coal off the nine acre tract any time Reedy got ready. Reedy then admits that the general manager told him at that time, and also later on, that appellee would haul the coal for him (Reedy), but adds that Mr. Boyd told him that they had decided not to haul any coal for anybody; adding that "he didn't tell me right out. He told me that they had decided not to haul coal for anybody," and Reedy admits that he never constructed a tipple to ship the coal from his nine acre tract and never made any attempt to ship the coal; Reedy also makes other admissions in his testimony, too numerous to be further alluded to here, which weaken very sensibly the credibility of his testimony where it is in conflict with that for appellee.

Only a few further facts will be mentioned, namely:

About two years after appellee had completed the narrow gauge railroad, C. C. Irvine, one of the appellants, obtained an option on what is referred to in the record as the "Jackson coal property," consisting of some ninety acres of coal land, which is located in the same vicinity as the coal property of the appellee. Subsequently the partnership of appellant was formed, the option on the Jackson property was closed, and the partnership of appellants became the owner of this property. According to the clear preponderance of the evidence, Irvine, before the option on the Jackson property was closed, was expressly notified by the president of the appellee company that appellee's "arrangements for right of way over the Reedy land, or any other land where (the) railroad was, was absolute and sufficient for the purpose (appellee) wanted to use it for," and that the appellee could not be forced to haul coal from the Jackson property. However, the appellants thereafter took title to the Jackson property and after repeated efforts to force appellee by threats of litigation to consent to haul the coal from the Jackson coal property, finally, upon appellee's continued refusal to do so, instituted the above entitled suit No. 1.

Further, just before said suit No. 1 was brought, the president of the appellee company had an interview with appellant Reedy, in which, as Reedy admits in his testimony on re-cross-examination, the president told Reedy that the appellee was willing to haul the coal from Reedy's nine acre tract aforesaid, "as he had promised to haul it for him" (Reedy); but was not willing to haul the "Jackson coal."

Further: Not until after appellee refused to haul the "Jackson coal" did Reedy, or any of appellants, object to the construction or operation of the railroad by appellee.

*Bird & Lively* and *Hall, Wingfield & Apperson*, for the appellants.

*Greever & Gillespie* and *Burns & Kidd*, for the appellee.

SIMS, J., after making the foregoing statement, delivered the following opinion of the court.

There are a number of interesting questions presented by the assignments of error and ably argued by counsel, both for appellants and appellee, in the briefs and orally before us; but we find it necessary to consider and decide only those which will be dealt with in their order as stated below.

[1] The first question we shall consider is the following, namely: ·

1. Does the preponderance of the evidence clearly establish that there were parol grants to the appellee, from the former owners of the surface of the lands affected, of the rights of way in question, which grants, were so far executed, prior to suit, by part performance on the part of the appellee, that it would be inequitable to rescind them, so that the grants will be upheld in equity as irrevocable, on the same principle that a partly performed parol contract for the sale of land would be upheld?

This question must be answered in the affirmative.

[2] 1. Whether the doctrine in question is applicable to a mere license, so that an easement may be created thereby, when partly performed, has been the subject of an irreconcilable division of opinion among the American authorities. As said in note to the case of *Lawrence* v. *Springer*, 49 N. J. Eq. 289, 24 Atl. 933, 31 Am. St. Rep. 702, at p. 712 *et seq.*:   "The authorities upon

this branch of the law have ever been and still remain so conflicting as to make their reconciliation totally impossible upon any conceivable theory." In this note cases pro and con are cited. That such doctrine is not applicable to a mere license, so as to create an easement, even though partly performed, is said, in 18 Am. & Eng. Enc'l of Law (2nd ed.) pp. 1145-6, to be the prevailing rule in America. But what is a mere license within the meaning of these authorities is a very wide equity indeed, which, however, in view of the considerations upon principle and the authorities now to be mentioned, we do not find ourselves called upon to consider further than we do below.

It seems to be the practically unanimous holding of the authorities that the doctrine in question is applicable to the parol grant of easements, such as the right of way in question in the causes before us. See note to the case of *Smith* v. *Garbe*, 86 Neb. 91, 124 N. W. 921, 136 Am. St. Rep. at pp. 686, *et seq.*, and authorities cited; 1 Minor on Real Prop., section 136, quoted with approval in *Kent* v. *Dobyns*, 112 Va. 586, 72 S. E. 139; 10 Am. & Eng. Ency'l of Law (2nd ed.) p. 412; 9 R. C. L., section 15, p. 746; 1 Minor on Real Prop. sections 132, 133.

As said in the note just cited, at p. 692 of 136 Am. St. Rep.: "* * * The statute of frauds, as it is well known, is evaded in so many other instances by part performance of obligations, that it would be strange indeed if it did not also include the parol creation of an easement. In *Wynn* v. *Garland*, 19 Ark. 23, 68 Am. Dec. 190, the court, in announcing the application of the doctrine, said: ' * * notwithstanding the grant of an easement is embraced within the statute of frauds, and therefore must be in writing, yet it has been holden that a parol grant executed will be upheld and sustained

under the same circumstances and on the same principle that a parol contract for the sale of land would be.  See *Ricker* v. *Kelly*, 1 Me. 117, 10 Am. Dec. 38.' The doctrine is so generally well known that we do not devote further space to it here."

[3] In 1 Minor on Real Prop., sec. 136, this is said: "It seems, however, to be admitted that if the transaction be one which, if it were *under seal*, *would create an easement*, it being classed as a license merely because it is *oral*, upon a *part performance* thereof by the licensee by the expenditure of money, or otherwise, a. court of equity may regard it as an *equitable easement*, and therefore irrevocable."

This statement of the law is cited with approval, as aforesaid, in *Kent* v. *Dobyns*, 112 Va. 586, 72 S. E. 139, and is very helpful towards discovering a practical distinction between an easement and a license where, as said in 10 Am. & Eng. Enc'l of Law (2nd ed.) p. 413, "the line of distinction * * * is often obscure." See also what is said in sections 132 and 133 of Mr. Minor's learned and valuable work above cited, to the effect that a grant, which creates any interest or estate in land, is not a license, and creates an easement. See likewise note to *Ricker* v. *Kelly*, 1 Me. 117, 10 Am. Dec. pp. 42–3, on the same doctrine as applicable to parol creations of any interest or estate in land.

[4] And there is a class of cases, which, while not inclusive of all easements which may be created by parol under the doctrine under consideration, are yet so far on the hither side of the line of distinction just mentioned that few, if any, of the authorities have any doubt in treating them as involving easements created by parol; whether the method by which they are created be designated a "license," or by some other name.  In that class of cases the grant, or consent, or license in-

volved, to use the land of another, consists, not merely
in the permission given one to do something on his own
land which injuriously affects, or puts a burden upon
the land of the person giving the permission, but which
consists of the right to build and use, for a definite pur-
pose, some structure on the land of the latter, and where
the structure is accordingly built by the former, at large
outlay of expense, which would not have been made but
for the permission having been given; and the right is
held to be a contract right acquired by purchase for
valuable consideration, which, indeed, does not rest
entirely in parol, and which is coupled with an interest,
creating an interest in the land, and which, as it is
believed, the great weight of authority holds to be, in
equity, at least tantamount to, if not technically, an
easement.    The opinion of the court in *Lawrence* v.
*Springer*, 49 N. J. Eq. 289, 24 Atl. 933 (31 Am. St.
Rep. 702), calls attention to this class of cases.    This is
there said: "When A permits B to build a house upon
his land, the situation almost necessarily inplies the
existence of some contract, which is thus partly per-
formed between them; to some extent, therefore, such
a matter does not rest absolutely in parol, and the area
of possible fraud or perjury is therefore thus circum-
scribed and hindered.    But when B from his own land,
turns drains into the drains on the land of A, the situa-
tion does not imply a contract.    On the contrary the
situation denotes simply a trespass; consequently the
existence and character of the contract, if one exists, is
the pure creation of parol testimony."

When the test furnished by the authorities referred to
above is applied to the rights of way in question in the
causes before us we see that they constitute either ease-
ments, or what, in reason and by the great weight of
authority, is in equity, tantamount thereto.

[5] 2a. But it is contended on behalf of appellants that the evidence in these causes does not establish the existence of the parol grants of the rights of way in question—at least not by that degree of certainty of proof which is required to establish a parol contract for the sale of land. The testimony on this subject is conflicting. It has been referred to in the statement preceding this opinion to an extent which it is believed sufficiently discloses the nature of the controversy and of the conflicting testimony. The conflict is so sharp that the testimony cannot be reconciled. Where the truth lies depends upon the credibility to be given the conflicting testimony of the respective witnesses on the subject, when read in the light of the uncontroverted facts touching the surrounding circumstances. We deem it sufficient here to say that the internal evidence furnished by the manner in which the testimony of the respective witnesses was given, and the inferences to be drawn from the uncontroverted facts and from the testimony itself, satisfy us that the existence of the parol grants of the rights of way is clearly established by the preponderance of the evidence; and as clearly as a parol contract of sale of land is required to be established by the well settled rule on that subject, where possession of the land has been taken and improvements have been made thereon—that being in principle the situation involved in the instant causes.

[6] 2. Are the parol grants proved sufficiently definite in their terms, with respect to the width of the right of way, to authorize the appellee to first construct and operate a narrow gauge and subsequently a standard gauge railroad?

This question must be answered in the affirmative.

The proof is that the grants in the first instance authorized the construction and operation of a standard

gauge railroad.    Because of the unexpected interpo-
sition of the United States Government the appellee
was temporarily prevented from so constructing the
railroad in the first instance.    Appellee thereupon pro-
ceeded with the construction and operation authorized
to the full extent that it then could.    The land owners
affected acquiesced in this at the time.    Subsequently
and promptly following the release of the government
control of railroads appellee began the conversion of the
narrow gauge into a standard gauge railroad, which was
merely fully executing the grant in pursuance of the
original contracts proved.

In *Atkins* v. *Bordman* 2 Metc. (Mass.) 457, at page
468, 37 Am. Dec. 100, at p. 106, this is said: "When no
dimensions of a way are expressed, but the object is
expressed, the dimensions must be inferred to be such
as are reasonably sufficient for the accomplishment of
that object."    See, also, to the same effect, *Frank* v.
*Benesch*, 74 Md. 58, 21 Atl. 550, 28 Am. St. Rep. 237.

[7-9] 3.  Are appellants purchasers for value, without
notice of the aforesaid easements over the lands af-
fected, so that the doctrine of the parol grant of such
easements, which we have above considered, cannot be
held applicable in the causes before us?

This question must be answered in the negative.

It is settled, and, of course, well understood, that the
doctrine mentioned is not applicable as against pur-
chasers for value without notice of the easement.    But
in the cases involved in the instant causes, in so far as
the nineteen acre tract of land is concerned, the appel-
lants, being partners, were affected at the time the part-
nership acquired such parcel of land with the same
notice which the appellant Reedy, the former owner of
it, theretofore had of the existence of said right of
appellee to the said easement thereon and thereover;

and the preponderance of the evidence clearly shows, that that notice was actual, full and complete. So far as the other tract of three and a half acres is concerned, the preponderance of the evidence also clearly shows that before any purchase money was paid by the partnership of appellants and before the deed thereto was made to the latter by Mrs. Vance, the former owner of such parcel of land, the appellants had what amounted to actual notice of the existence of said right of appellee to the said easement thereon and thereover.

The decrees under review in both of the above entitled causes will be affirmed.

*Affirmed.*