# Staunton

OLLIE MAE CARPENTER, ET ALS. V. JAMES STAPLETON, ET ALS.

September 23, 1937.

Present, All the Justices.

24

The opinion states the case.

*W. L. Davidson* and *Pennington & Pennington,* for the appellants.

*J. C. Noel* and *Guy A. Kaufman,* for the appellees.

HUDGINS, J., delivered the opinion of the court.

The appellants, heirs of J. P. Shelborne, instituted this suit, against the heirs of Elias Harber, to restrain them from using a private way across a tract of land appellants inherited from J. P. Shelborne. To a decree declaring that appellees, as heirs of Elias Harber, have an easement in the way, this appeal was allowed.

While both sides introduced evidence tending to support their respective theories, we think the following facts are reasonably well established: James Shelborne, at the time of his death in 1890, owned a tract of some 400 acres of land in Lee county. This land was bounded on the northeast, in part, by a public highway known as Shaffer's Ford road, and on the southwest, in part, by a public highway known as Cane Creek road, or Bumgardner Mill road. The private way in question extended from the entrance into Shaffer's Ford road, in a southwestern direction, some 2,300 feet, across this land, to Bumgardner Mill road. A rail fence was built around the entire tract with a gate across the entrance at Shaffer's Ford road, and later, when the land was divided into different fields, other gates were placed where the fences dividing the fields crossed this road.

Soon after the death of James Shelborne, his two sons, J. P. Shelborne and Geo. I. Shelborne, acquired, by inheritance and purchase, the entire tract. J. P. Shelborne acquired a two-thirds undivided interest, and Geo. I. Shelborne acquired a one-third undivided interest. These brothers verbally agreed to divide the tract between them. By this agreement Geo. I. Shelborne received, as his portion, the western part of the farm, bounded by the Bum-

gardner Mill road. This tract, as laid off for Geo. I. Shelborne, was very irregular in shape. The distance between the southwest and the northwest corners was some 5,600 feet, and not over 300 feet wide in the center where it touched the Bumgardner Mill road. The private way extended across this narrow 300 foot strip, and 2,000 feet across the land assigned to J. P. Shelborne. The brothers took possession and control of the separate tracts, and each used at will the private way across the land of the other.

In 1898 Antioch church was built on the eastern side of Shaffer's Ford road, and some 200 feet south of the entrance to the private right of way. J. P. and Geo. I. Shelborne were interested in the erection of the church. Each gave permission to the public to use the private way for the purpose of attending worship at the church, but upon condition that the gates across the road would be kept shut.

In 1903 or 1904 Geo. I. Shelborne sold his part of the 400 acre tract to Elias Harber. Before the sale was closed, the question of the right of way or outlet across the lands of J. P. Shelborne to Shaffer's Ford road, was raised. The parties to the negotiation had an interview with J. P. Shelborne about this outlet, and were informed by him that Geo. I. Shelborne had a right of way across his land to Shaffer's Ford road, and J. P. Shelborne had a right of way or outlet across the lands of Geo. I. Shelborne to the Bumgardner Mill road. Upon receiving this assurance, Elias Harber consummated the deal, and Geo. I. Shelborne executed and delivered a deed bearing date February 4, 1905, conveying his part of the land to Elias Harber.

J. P. Shelborne and Elias Harber, and their families, lived upon their respective tracts of land, were neighborly and rather intimate. Each continued to use the private way in question, without let or hindrance, until 1928, when Elias Harber died. His land, the Geo. I. Shelborne tract, was, by order of court, partitioned among his heirs. In making the partition two of the commissioners stated that they understood that the private way was appurtenant to the

Elias Harber tract, and that it was the only outlet for two lots assigned to two of the heirs of Elias Harber.

In 1932, J. P. Shelborne died. His part of the 400 acre tract passed to appellants as his heirs at law. In 1933, or later, the Highway Commission began to improve the private way under the belief that it was a part of the secondary highway system of the Commonwealth. The heirs of J. P. Shelborne objected, and work on this road was stopped. Later locks were put on the gates and keys were given to the Harber heirs. Search seems to have been made of the records, but no grant of the land or roadway between Geo. I. Shelborne and J. P. Shelborne was found. Thereafter the J. P. Shelborne heirs so obstructed the road that passage over it was impossible. The Harber heirs attempted to have the obstructions removed. Thereupon this suit was instituted to restrain the Harber heirs from committing, as the bill charged, a continuing trespass.

Appellants contend that the origin of the use of the road has been shown by their evidence to be in permission given to the public in 1898 by George I. and J. P. Shelborne for the purpose of attending services at Antioch church, and that in 1903 or 1904, J. P. Shelborne extended this permission to Elias Harber when he purchased from Geo. I. Shelborne, and that having shown the origin of use to be by permission, such use was not adverse and could never ripen into an easement. To support this position numerous decisions of this court are cited, the latest being *Rives* v. *Gooch,* 157 Va. 661, 162 S. E. 184.

The fallacy of the contention lies in the statement of facts. There is some evidence tending to support the statement as to the origin of the way, but several of appellees' witnesses testified that the way had been used by the public for more than sixty years, long before Antioch church was built; that after the church was erected it was more extensively used than before. However this may be, when Elias Harber appeared upon the scene the roadway was well defined, and constituted the main and most convenient outlet from the Harber tract to Shaffer's Ford road. The evidence

for appellees tends to show that Geo. I. Shelborne used this private way under a claim of right and that J. P. Shelborne, in his presence, recognized that right. As heretofore stated, Elias Harber, before buying, asked J. P. Shelborne about an outlet to Shaffer's Ford road from the tract he was contemplating purchasing, and was told that he would have the same right to cross the J. P. Shelborne land that his brother Geo. I. Shelborne had. At that time there had been no legal division of the 400 acres, only a parol partition; hence neither brother had a legal right to deny to the other the use of the roadway. Acting on these representations, made by the owners of the land, who had a right to grant an easement, Elias Harber paid the purchase price, and took possession of the George I. Shelborne part of the land.

Appellants admit that such a conversation took place, but contend that it proves nothing more than that J. P. Shelborne gave Elias Harber permission to use the way across his land to Shaffer's Ford road. Even if we concede that two constructions or two inferences may be drawn from the testimony of the witnesses as to statements they heard Elias Harber and J. P. Shelborne make, the situation of the parties and their subsequent conduct in relation to the way clearly show that more than a mere license was intended. In the deed to Elias Harber, Geo. I. Shelborne reserved a certain portion of the standing timber on the tract for the benefit of J. P. Shelborne, with a right of ingress and egress for the purpose of cutting and removing the timber. This is written evidence of the fact that in the parol partition between the brothers something more than a mere division of the land was included in the agreement. The statements alleged to have been made by Geo. I. and J. P. Shelborne concerning the right of one to cross the other's land indicate that rights of way or outlets to the two public roads were also subject to the discussion and agreement between them.

"Mere acquiescence by the licensor should not furnish grounds for an estoppel in favor of the licensee. There is normally no obligation on the licensor to speak, since the licensee should be held to know the limits of his

rights. However, affirmative conduct on the part of the licensor, inducing expenditures, will be basis for an estoppel. Whether there has been such affirmative conduct by the licensor is, of course, a question of fact.

"It seems, however, to be admitted that if the transaction be one which, if it were under seal, would create an easement, it being classed as a license merely because it is oral, upon a part performance thereof by the licensee by the expenditure of money or otherwise, a court of equity may regard it as an equitable easement, and therefore irrevocable in equity." Minor on Real Property (2d Ed.), vol. 1, sec. 132. See *Munden* v. *Munden,* 136 Va. 30, 116 S. E. 372; *Clark* v. *Reynolds,* 125 Va. 626, 100 S. E. 468.

The last-quoted paragraph has been twice approved by this court. See *Buckles* v. *Kennedy Coal Corporation,* 134 Va. 1, 114 S. E. 233; *Kent* v. *Dobyns,* 112 Va. 586, 72 S. E. 139.

Appellants further contend that it is not certain what roadway was in the mind of the parties at the time Elias Harber had the interview with J. P. Shelborne, and for that reason appellees are not entitled to an easement.

It seems that in 1904 there was another roadway leading from the Harber tract, by the residence of J. P. Shelborne, connecting with Shaffer's Ford road a half mile or more further south than the roadway in dispute. This other road was used occasionally by Harber and others. It seems to have been generally regarded as a private road, and open solely for the benefit of J. P. Shelborne. In recent years it has been very little used. The uncertainty as to the roadway contemplated by Elias Harber and J. P. Shelborne is entirely removed by the testimony of Mrs. Elias Harber and others. Mrs. Harber stated that the roadway in dispute, if not actually pointed out to her husband as his outlet, was definitely stated to be Harber's right of way, and that he claimed the right to use no other way across J. P. Shelborne's land. One of Elias Harber's sons said that his father frequently, while traveling the road in dispute, told him that particular road was his right of way or outlet to

Shaffer's Ford road. He caused holes in the road to be filled, and otherwise assisted in maintaining it.

One witness testified that prior to the sale to Elias Harber, he was a tenant of J. P. Shelborne, and as such tenant, in clearing up the land, he threw some brush in this road, and that J. P. Shelborne ordered the road in controversy to be kept free of brush, as "it was George's (Geo. I. Shelborne) right of way, and my way of getting out."

Another one of J. P. Shelborne's tenants had become somewhat irritated because parties using this road had repeatedly left a gate open. To stop this he put a lock upon the gate. As soon as this fact was brought to the attention of J. P. Shelborne, he ordered the lock removed, with the statement that "this was Elias Harber's right of way, and it must be kept open." J. P. Shelborne, on another occasion saw his tenants plowing very close to the road, and again he cautioned the tenant not to plow up the road because it was "Elias Harber's right of way and my way out."

At the time Harber acquired the easement there was one or more gates across the road. Since that time other gates have been built, or the same gates moved to other locations for the more convenient use of the servient estate.

■ "The rule is general that the landowner may put gates and bars across a way over his land, which another is entitled to enjoy, unless, of course, there is something in the instrument creating the way, or in the circumstances under which it has been acquired or used, which shows that the way is to be an open one. The easement of way is for passage only. The land remains the property of the owner of the servient estate and he is entitled to use it for any purpose that does not interfere with the easement." *Davis* v. *Wilkinson*, 140 Va. 672, 681, 125 S. E. 700, 703.

■ Under the circumstances we do not think that the gates placed across the road were intended to prevent the owners of the dominant estate from using the road. The parties themselves did not so regard it.

■ It is argued that the fact that there has been some slight change in the location of the roadbed is sufficient to

defeat the right to an easement. The changes seem to have been made without objection by the parties. On this point the case is controlled by *Hammond* v. *Ryman,* 120 Va. 131, 90 S. E. 613, 614, where, in disposing of a similar contention, this is said: "The changes in the location of the road, which were made by Hammond and for his own convenience, and acquiesced in by the owners of the sixty-one acre tract, were equivalent to changes of the route by agreement, and did not, in any way, prejudice the rights of the complainant Ryman."

The decree of the learned chancellor of the trial court was in accord with the principle stated. However, the decree entered did not state the width of the easement to be as now established, or that the owner of the servient estate, in farming the lands affected, had the right to erect gates across the road so long as such gates did not unreasonably interfere with the use of the road by the owners of the dominant estate.

The cause will be remanded to the circuit court, with direction to amend its decree so as to include these provisions. In all other respects the decree appealed from is affirmed.

*Affirmed and remanded.*