## Richmond

### LEE MOORE, ET AL. v. JAMES S. LEWIS, ET AL.

March 4, 1968.

Record No. 6538.

Present, All the Justices.

*William B. McLeod (Dunton, McLeod & Simmons*, on brief), for appellants.

*W. Garland Clarke; M. Ray Johnston (Clarke & Johnston*, on brief), for appellees.

BUCHANAN, J., delivered the opinion of the court.

James S. Lewis and forty-two others, complainants, in July, 1965, filed their bill for a declaratory judgment against Lee Moore and Gladys D. Moore, his wife, defendants, asking the court to determine the rights of the parties in and to a landing and access roadway thereto on the land of the defendants at the mouth of Beach Creek, which empties into the Rappahannock River in Lancaster county.

The bill alleged (1) that many of the complainants are watermen who for more than forty years have depended on using the landing and roadway to harbor their boats in their fishing and oyster business; have spent money and labor on the landing and roadway and

the channel leading thereto; and that the defendants and their predecessors, with knowledge of the use, through declarations, actions and failure to act, have made a dedication and acceptance, resulting in a right of the complainants and the public to free and unencumbered use of the access road and landing; and (2) that said access road and landing have for more than twenty years been used by the complainants and their forefathers continuously, adversely, uninterruptedly, openly and hostilely to the defendants and their predecessors and (3) about 1945 complainants and others established a Beach Creek Harbor Fund as a community project to improve the harbor facilities and access thereto, and one of the defendants and the complainants together contributed money and labor toward improving the roadway and landing and channel with the consent of the defendants.

It is further alleged that the defendants had unlawfully erected a wire fence which prevented the complainants from using the facilities and the bill prayed for a temporary injunction which the court granted.

Defendants filed their answer denying that complainants were entitled to the relief sought; the court heard evidence *ore tenus* and stated its conclusion to be that the complainants had not proved any right by prescription or dedication, but decreed as follows:

(1) That the complainants, their successors and assigns, by reason of their expenditures, labor and improvements, "have a license coupled with an interest" in the landing, "which said license creates an interest in the land," and that they have the right to use, maintain and improve the landing and the access roadway leading thereto; and

(2) That the complainants, their successors and assigns, have "an equitable easement" in the landing and access thereto "which is irrevocable," and "defendants are estopped" from obstructing or interfering with the use by the complainants, their successors and assigns, of the access roadway, the landing and other facilities located thereon, and the temporary injunction was made permanent.

The defendants have appealed from that decree.

Only eight of the forty-three complainants testified. The evidence does not show specifically the basis of the rights decreed to the others and their successors. In practical effect the decree creates a public landing and access road on the defendants' land, which some of the complainants attempted without success to have done by the Board of Supervisors a few years before this suit was brought, as re-

ferred to below. The eight complainants who gave evidence testified in 1966 essentially as follows:

Lloyd Jenkins had lived at Beach Creek thirty-four years and his first recollection of anything being done there was in 1935, when he and some others built a wooden jetty at the mouth of Beach Creek about where one is now. People were then using the landing "when they could get in and out," which was only at high tide. The first dredging was done in the creek about 1936, not long after the jetty was finished, and after that "we all used the boats in there just like we are doing now." The channel has been dredged three times, the first and second times by the government, and the third time "Mr. Dawson dug it out for us" and some concrete blocks from the abandoned Tappahannock Bridge were put in.

There has been a road leading down to the landing ever since he could remember, and around twenty-one or twenty-two boats were in there last winter when there were oysters to "catch" in the Rappahannock. Now there were no oysters in the Rappahannock "and practically everybody has their boats up the Potomac River." Only four boats were now at the landing. Most of the fishermen keep their boats anywhere they can tie up in there. He had never been stopped from using the landing and had never asked anybody for permission to do so. There is an artesian well at the landing, dug by local people.

To go down to the landing "we would drive down to the top of the hill [end of State Highway No. 628] and walk down", using some steps that Moore had built.

About the end of the summer of 1964, Moore asked him how he felt about paying $12 a year for tying up in the creek and he replied that he would wait and see what the rest of them were going to do. He had never claimed to Moore that he had a right to use the landing. He knew he was using Moore's property until "the fuss was raised about it". He did not have any part in improving or building the road down the bank after the steps fell into disuse. The community helped to do it. He joined in the petitions to the Board of Supervisors in 1949 to establish a public landing at the place.

R. L. Dodson, who was seventy years old, began oystering when he was sixteen. He would tie his boat a little to the right of the present landing and has been using the landing ever since. He had used the landing continually since he was a boy and the road down to it has been where it is now. It was made when "we would grub that bank away and fill it down." Nobody gave him permission, but nobody ever stopped him. He did not know of any other place on

Beach Creek that could be use as a public landing. He was one of the group who tried to get the Board of Supervisors to take over this landing for a public landing and pay Moore for the land, but Moore wanted too much for it; and instead of the county taking it over, Moore said to go ahead and he would let them use it.

Complainants Shelton Lewis, William Henry Kenner, Jerry Redmond and Edward Hayden testified that the landing and the road down to it had been used for many years. The use made of the landing was for tying up boats, and on occasion during the oyster season as many as twenty-one or twenty-two boats were there. Everybody interested had helped to build the first jetty. Beach Creek is shallow and people could not use their boats before the dredging. Moore had spoken about payment for the use of the road and landing and they said they would do what the other users would, but they made no payments and obtained no permission for the uses. Edward Hayden testified that he accepted Moore's proposition about charging for the use of the road and landing, which he said were on on Moore's property. He did not pay as promised but Moore granted his request and allowed him to use the facilities anyway.

William H. Towles had been living in the Beach Creek area since 1938. He served as treasurer of the funds contributed "by local people" for building a jetty and for dredging. In 1949 total collections of $1970.27 were spent to rebuild the jetty and for surveying. Defendant Moore contributed $25 to this fund.

When he, Towles, moved there in 1938, the landing was a pile of dirt and between it and the foot of the hill where the road came down there was a marsh. The old road bed had grown up in weeds and in 1945 "they" leveled down the pile of dirt and rebuilt the road to the present landing. At that time his mother and Moore owned the land together. This was all done with the consent, expressly given, of his mother and Moore.

V. R. Chowning testified that in 1962 he paid Dawson $1800 for digging out the channel and jetty, and $1000 was paid for the concrete slabs from the abandoned Tappahannock Bridge which were put in the jetty. This money came from "the whole neighborhood." He remembered that in 1951 and 1952 an effort was made to establish a public landing in this vicinity. He was a member of the commission appointed to ascertain what amount should be paid to Moore for his damage, which the commission ascertained to be $2350, but this project fell through. Since then other money collected has been spent on the channel.

Defendant Lee Moore was called by the complainants as an adverse witness and testified that the landing and road leading to it were on his property and he filed deeds evidencing his title; that the road leads from the end of State Highway 628 and goes southerly about thirty feet and then westerly about 100 feet down the hill to the landing.

Examined by his own counsel, he testified that when he acquired this property in 1932 no landing was there, only a grown up river shore. In 1935 or 1936 he built steps down the bank for personal use and he permitted others to use them. In 1946 the steps were falling down, wives of the fishermen were using them and the men asked to be allowed to build a road down the bank and he gave them permission to do so, and it was used with his permission until he closed it by building the fence shortly before this suit was brought.

Prior to erecting the fence he had gone to see "all the fellows that used the creek," naming the eight who testified and one other. He told them that the road was becoming almost impassable and that he would build a good hard-surfaced road to the landing, make a parking place there and give them permission to use the road and landing and parking place for $12 per year per boat. Six of the nine agreed, but three refused, and he returned the money to those who had paid. He then closed the road because of the nuisance being created by the users of his property.

He testified that R. E. Naumann, Jr., one of complainants but not called by them to testify, had paid rent for a number of years for the privilege of buying oysters at the landing and that Naumann admitted he did not have that right.

The use made of his property by others, including installation of the artesian well, was with his consent; he did not object, he said, but was glad to be a good neighbor and wanted to help them out.

The records of the Board of Supervisors of Lancaster county showed the following:

At a meeting of the Board on October 6, 1949, "certain citizens, living in and adjacent to Beach Creek" filed a petition seeking to have established a public road from State Highway 627 [sic] to the Rappahannock River at Beach Creek and a public landing at the mouth of Beach Creek not to exceed one-half acre. The clerk of the Board was directed to communicate with Mrs. Vera B. Towles and Lee Moore, joint owners of the land on which the proposed road and landing are located, to ascertain whether they would dedicate suffi-

cient land for this purpose, or, if not what they would sell it for to the county.

At a meeting on April 4, 1951, viewers were appointed to investigate and report according to § 33-142 of the Code. On June 6, 1951, the Board approved the establishment of the landing and road. On December 5, 1951, commissioners were appointed to ascertain a just compensation for the land to be taken for such road and public landing.

On January 18, 1952, other viewers were appointed and directed to meet on the premises with the petitioners and their attorneys and Lee Moore and his attorney, and if Moore "does not require compensation and will execute his written consent giving the right-of-way in question, the viewers shall obtain such consent and return it with their report". Moore testified that this attempt did not go through; that he did not convey the property to the county and was never paid.

As stated, the court below found that the complainants did not acquire any right to the road or the landing by prescription or by dedication. We agree with that conclusion and the complainants filed no cross-error to that finding.

We disagree, however, with the holding that the complainants, their successors and assigns, acquired a license coupled with an interest in the landing which creates an interest in the land, and that they have an "equitable easement" in said landing and access thereto "which is irrevocable" and which the defendants "are estopped" from obstructing or interfering with.

From the court's opinion in the record it appears that this was primarily on the ground that when people of the community in 1962 raised $2800 and bought the concrete slabs and paid Dawson for repairing the jetty and dredging the channel, the Moores had an obligation to object or assert their title and because of their failure to do so the complainants and their successors and assigns acquired the rights granted by the decree.

The contributing of this money by the people of the community was a voluntary act done for their own purposes and benefit. There was no obligation on the Moores to object and to warn against this being done. They were part of the community and would benefit along with others in the community by the work. Moore had made a money contribution to similar work at a previous time and over the

years had permitted anybody who desired to do so to use his property for such purposes.

Admittedly the defendants had asserted their ownership of the road and of the landing on many occasions. As late as 1952 the Moores' ownership of the property, including the road and the landing, was publicly recognized in the community and the complainants, or those of them who were interested, petitioned the Board of Supervisors to condemn the road and the landing as a public facility and viewers were appointed to procure the consent of the Moores to donate the land for this purpose.

The case of *Buckles* v. *Kennedy Coal Corp.*, 134 Va. 1, 114 S.E. 233, relied on by the complainants, does not support their claim. The court in that case was concerned with the question of whether specific parol contracts for rights of way upon which the defendant had relied in making large expenditures would be enforced under the doctrine of part performance. The court stated that the evidence clearly established that there were "parol grants to the appellee" of the rights of way in question which were so far executed by part performance that it would be inequitable to rescind them, "on the same principle that a partly performed parol contract for the sale of land would be upheld"; and, the court added: "It seems to be the practically unanimous holding of the authorities that the doctrine in question is applicable to the parol grant of easements, such as the right of way in question in the causes before us." 134 Va. at 15, 114 S.E. at 237.

In the course of its opinion the court said: "In that class of cases [of easements which may be created by parol] the grant, or consent, or license involved, to use the land of another, consists, not merely in the permission given one to do something on his own land which injuriously affects, or puts a burden upon the land of the person giving the permission, but which consists of the right to build and use, for a definite purpose, some structure on the land of the latter, and where the structure is accordingly built by the former, at large outlay of expense, which would not have been made but for the permission having been given; and the right is held to be a contract right acquired by purchase for valuable consideration, which, indeed, does not rest entirely in parol, and which is coupled with an interest, creating an interest in the land, and which, as it is believed, the great weight of authority holds

to be, in equity, at least tantamount to, if not technically, an easement. * *" 134 Va. at 16-17, 114 S.E. at 237.

But in the present case there was no parol grant of a right of way and no structure placed on the defendants' land. The expenditures for the dredging of the channel and for the construction of a new jetty were not made to improve the defendants' land. They were made for the benefit of all persons who might use Beach Creek. The defendants had no title to the channel or to the site of the jetty, which was on the opposite side of the creek from the defendants' land. They had no right to authorize or object to the making of those improvements. Therefore, the principle applied in *Buckles* v. *Kennedy Coal Corp.*, *supra*, is inapplicable to this case; and the trial court erred in holding that, by virtue of the expenditures, the complainants acquired a "license coupled with an interest" or "an equitable easement * * * which is irrevocable".

The real effort of the complainants in this case was to establish a right by prescription based on long use of the roadway and landing without objection by the defendants. But the evidence clearly shows that the use was permissive, not adverse under a claim of right but with recognition of the title and ownership of the defendants, and in common with the defendants and the people of the community generally. Under long established rules such use does not give an irrevocable right of use or an equitable easement to individuals who have used the facilities along with the general public. *Reid* v. *Garnett*, 101 Va. 47, 43 S.E. 182; *Witt* v. *Creasey*, 117 Va. 872, 86 S.E. 128; *Eagle Lodge* v. *Hofmeyer*, 193 Va. 864, 71 S.E.2d 195; *Craig* v. *Kennedy*, 202 Va. 654, 119 S.E.2d 320.

The decree appealed from is reversed, the injunction is dissolved and the complainants' bill is dismissed.

*Reversed and dismissed.*