**MULTI–CHANNEL TV CABLE COMPANY, d/b/a Adelphia Cable Communications, Plaintiff–Appellant,**

**v.**

**CHARLOTTESVILLE QUALITY CABLE CORPORATION, a Virginia corporation; Charlottesville Quality Cable Operating Company, a Virginia corporation; Management Services Corporation of Charlottesville, a Virginia corporation; Madison Limited Partnership, a Virginia limited partnership; Cabell Limited Partnership, a Virginia limited partnership; Brandon Limited Partnership, a Virginia limited partnership; Four Seasons Apartments Limited Partnership, a Virginia limited partnership; Sherwood Manor Limited Partnership, a Virginia limited partnership; George B. McCallum, III, Trustee of Oxford Hill Land Trust; David W. Kudravetz, Trustee of Oxford Hill Land Trust; L–R Investments, a Virginia limited partnership, Defendants–Appellees.**

**MULTI–CHANNEL TV CABLE COMPANY, d/b/a Adelphia Cable Communications, Plaintiff–Appellee,**

**v.**

**CHARLOTTESVILLE QUALITY CABLE CORPORATION, a Virginia corporation; Charlottesville Quality Cable Operating Company, a Virginia corporation; Management Services Corporation of Charlottesville, a Virginia corporation; Madison Limited Partnership, a Virginia limited partnership; Cabell Limited Partnership, a Virginia limited partnership; Brandon Limited Partner-ship, a Virginia limited partnership; Four Seasons Apartments Limited Partnership, a Virginia limited partnership; Sherwood Manor Limited Partnership, a Virginia limited partnership; George B. McCallum, III, Trustee of Oxford Hill Land Trust; David W. Kudravetz, Trustee of Oxford Hill Land Trust; L–R Investments, a Virginia limited partnership, Defendants–Appellants.**

Nos. 94–2340, 94–2383.

United States Court of Appeals,
Fourth Circuit.

Argued June 7, 1995.

Decided Sept. 18, 1995.

**ARGUED:** John Douglas McKay, Barrick & McKay, Charlottesville, VA, for appellant. Deborah Colleen Costlow, Winston & Strawn, Washington, DC, for appellees. **ON BRIEF:** David C. Wagoner, Barrick & McKay, Charlottesville, VA; Randall D. Fisher, John B. Glicksman, Adelphia Cable Communications, Coudersport, PA; Philip J. Kantor, Bienstock & Clark, Miami, FL, for appellant. Alan G. Fishel, Winston & Strawn, Washington, DC, for appellees.

Before WILKINSON, HAMILTON, and MICHAEL, Circuit Judges.

Affirmed by published opinion. Judge HAMILTON wrote the opinion, in which Judge WILKINSON and Judge MICHAEL joined.

**OPINION**

HAMILTON, Circuit Judge:

This appeal raises numerous issues arising from a dispute between competing cable television operators in the City of Charlottesville, and Albemarle County, Virginia, whereby one of the cable operators disconnected the service of the other to certain multi-dwelling units (MDUs) in those areas. The disconnected cable operator brought suit against the disconnecting cable operator, the owners of the MDUs, and the company that managed all but one of the MDUs, alleging these parties had committed various torts in conjunction with the disconnection of its service. We affirm.

**I.**

**A.**

Appellant/Cross–Appellee Multi–Channel TV Cable Company d/b/a Adelphia Cable Communications (Adelphia) and Appellee/Cross–Appellant Charlottesville Quality Cable Corporation (CQC) are competing cable television providers in the City of Charlottesville and Albemarle County, Virginia. Adelphia has been a franchised provider of cable television in Charlottesville and Albemarle County since 1974. In 1981, Adelphia installed cable distribution systems in six MDUs[1] at its own expense. These systems, known as "home run" systems, replaced the previous "bulk service" systems in which the landlords subscribed to the cable television service in bulk, paid Adelphia one monthly fee, and provided their tenants cable television as part of their lease obligations. The installation of the home run systems entailed installing junction boxes at the end of Adelphia's signal feeder lines at the MDUs and running separate cable wires from the junc-

[1]. These MDUs are Preston Square Apartments (owned by L–R Investments, a limited partnership), Cambridge Square Apartments (owned by Madison Limited Partnership), Ash Tree Apartments and Townhouses (owned by Cabell Limited Partnership), Brandon Apartments (owned by Brandon Limited Partnership), Oxford Hill Apartments (owned by Oxford Hill Land Trust), and Country Green Apartments (owned by Sherwood Manor Limited Partnership).

tion boxes to each individual unit. Installing the home run systems cost Adelphia $38,-872.72.

In 1983, Adelphia installed a home run system in a seventh MDU, Four Seasons, located in Albemarle County, Virginia. The installation was identical to the installations at the other six MDUs, except that Adelphia installed the home run system at Four Seasons pursuant to a contract, executed in 1981 and updated in 1983, between Adelphia and the owner of Four Seasons, which contract provided Adelphia the exclusive right to furnish cable service to every unit at Four Seasons until September 1, 1991. Installing the home run system at Four Seasons cost Adelphia $27,981.73.

After installation of each home run system, each tenant at the MDUs could negotiate individual subscriptions with Adelphia for cable television service. Subsequently, many tenants did subscribe with Adelphia for varying packages of cable television services lasting various durations. Adelphia always serviced and maintained the home run systems at its own expense.

### B.

Between February 1991 and March 1992, CQC obtained exclusive provider agreements with the MDU owners which rendered CQC the exclusive provider of cable television service in exchange for twelve percent of any cable subscriptions CQC could obtain at the MDUs.[2] Premised on this contract authority, in August 1992, CQC and the MDU owners disconnected Adelphia's access to the MDUs by sending a group of CQC employees to physically cut Adelphia's signal carrying feeder lines which ran to the home run systems at the MDUs. Simultaneously, CQC employees connected CQC feeder lines to the home run systems that Adelphia had installed at all the MDUs. In addition, Sherwood Manor Limited Partnership, the owner of

Country Green Apartments, and the Management Services Corporation of Charlottesville (MSC), the managing agent for all of the MDU owners other than Sherwood, barred Adelphia from further entry into the premises of all the MDUs.

### C.

Immediately following the disconnection of its service at the MDUs, Adelphia sought a temporary and permanent injunction in Virginia State court to restore its access to the MDUs. Subsequently nonsuiting its litigation in state court, Adelphia filed a diversity action, see 28 U.S.C.A. § 1332 (West 1993), in the United States District Court for the Western District of Virginia against CQC, Charlottesville Quality Cable Operating Company,[3] MSC, L–R Investments, Madison Limited Partnership, Cabell Limited Partnership, Brandon Limited Partnership, Four Seasons Apartments Limited Partnership, Sherwood Manor Limited Partnership, and George McCallum and David Kudravetz as trustees of Oxford Hill Land Trust (collectively, Appellees). Adelphia's complaint sought the declaration of easement rights in its favor and alleged the following seven claims: (1) interference with the co-use of easements against CQC, MSC, Sherwood Manor, Madison, Oxford Hill, and Cabell; (2) interference with easements by estoppel against all the Appellees; (3) interference with irrevocable licenses against all the Appellees; (4) conversion of Adelphia's cable wire by all the Appellees; (5) tortious interference with existing and prospective contractual relationships against all the Appellees; (6) unjust enrichment against CQC; and (7) violation of section 55–248.13:2 of Virginia Residential Landlord and Tenant Act (VRLTA), see Va.Code Ann. § 55–248.13:2 (Michie 1986) against MSC and all the MDU owners. With respect to the claims for interference with the co-use of

---

**2.** The actual agreements stated they were between CQC and Caton Cable Corporation (Caton Cable), acting as consultant for the MDU owners. Doug Caton owned one-hundred percent of Caton Cable and had controlling interest in many of the MDUs. Because of this cross-ownership, the district court found that the agreements were in fact between CQC and the MDU owners, not

Caton Cable. The Appellees do not challenge this finding as clearly erroneous.

**3.** Charlottesville Quality Cable Operating Company is somehow related to Charlottesville Quality Cable Corporation, but the record is unclear as to the nature of this relationship.

easements, irrevocable licenses and easements by estoppel, Adelphia sought compensatory damages for the loss it allegedly sustained by the interruption of its services to its subscribers at the MDUs, an injunction against further interference with its alleged easements over and to the MDUs, and an injunction restoring its access to the MDUs. With respect to the conversion claim, Adelphia sought to recover the value of its cable wires that remained on the premises of the MDUs and were used by CQC to provide its cable services to the tenants. With respect to the tortious interference claim, Adelphia sought compensatory damages in excess of $50,000 and punitive damages of $350,000. With respect to the unjust enrichment claim, Adelphia sought the imposition of a constructive trust on the revenues earned by CQC through the use of Adelphia's equipment. With respect to the claim under the VRLTA, Adelphia sought damages as well as an injunction restoring its access to the MDUs.

Adelphia moved for summary judgment on the two interference with easements claims and the interference with irrevocable licenses claim. Adelphia moved for summary judgment on the remaining claims with respect to liability only. The Appellees moved for summary judgment in their favor on all the claims. The district court denied Adelphia's summary judgment motion *in toto,* but granted summary judgment in favor of the Appellees on the two interference with easements claims and the interference with irrevocable licenses claim. Additionally, the district court refused to enter an injunction under the VRLTA restoring Adelphia's right of access to the MDUs. The district court denied summary judgment in favor of the Appellees on the remaining claims. Consequently, the district court conducted a bench trial on the conversion, tortious interference, unjust enrichment, and VRLTA claims. Following this trial, the district court entered judgment in favor of Adelphia on all of those claims, except the unjust enrichment claim.

As to remedy, the district court awarded Adelphia: (1) $68,000 for the conversion of

its cable wires, and (2) $219,887 for both the tortious interference with its existing and prospective contractual relationships and for violations of the VRLTA. Additionally, the district court granted an injunction that enjoined the MDU owners and MSC from continuing to provide CQC with access to the MDUs under the exclusive provider agreements and allowed the MDU owners thirty days from the date of the order to either: (1) disgorge the fees they had already received from CQC under the exclusive provider agreements; or (2) terminate CQC's right of access under those agreements. Notwithstanding any disgorgement, the injunction provided that the parties present the district court with any future agreements between the MDU owners and CQC that purported to grant CQC access to the MDUs, the purpose of such presentation being the ascertainment of whether the access was being granted "in exchange for fees or other things of value that have been paid or that might be paid in the future." (J.A. 3445). The district court ordered that if the injunction had not dissolved before March 19, 2002, then it would expire on that date as to all MDU owners, except Sherwood Manor. As to Sherwood Manor, the district court ordered that the injunction continue until either of these two conditions were met and it showed the court that access to the premises of Country Green Apartments by CQC was not in exchange for a fee or any other thing of value.[4] This appeal followed.

### D.

Adelphia appeals the grant of summary judgment in favor of Appellees on Adelphia's interference with co-use of easements claim, interference with irrevocable licenses claim, and interference with easements by estoppel claim. Adelphia appeals the compensatory damage award as inadequate on its claims of conversion, tortious interference with existing and prospective contractual relationships, and violation of section 55-248.13:2 of the VRLTA. Adelphia also appeals the district court's holdings that it was not entitled to a

---

**4.** The record is unclear why the district court treated Sherwood Manor Limited Partnership differently than the other MDU owners, and the parties have not attempted to clear the confusion for us.

constructive trust or punitive damages. Finally, Adelphia appeals the district court's ruling that under the VRLTA, the district court could not issue an injunction restoring Adelphia's right of access to the MDUs. The Appellees cross-appeal the entry of judgment in favor of Adelphia on Adelphia's conversion claim and tortious interference with existing and prospective contractual relationships claim. The Appellees appeal the compensatory damage award for Adelphia's lost profits from prospective cable subscriptions as excessive. The Appellees also raise a constitutional takings challenge to section 55–248.13:2 of the VRLTA. We affirm.

## II.

Adelphia first appeals the district court's grant of summary judgment in favor of the Appellees on Adelphia's three claims based on the law of easements and licenses: (1) interference with the co-use of easements; (2) interference with irrevocable licenses; and (3) interference with easements by estoppel.

Fed.R.Civ.P. 56(c) requires that the district court enter judgment against a party who, "after adequate time for discovery ... fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). To prevail on a motion for summary judgment, a party must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) it is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). If "the evidence [is] 'so one-sided that one party must prevail as a matter of law,' " we must affirm the grant of summary judgment in that party's favor. *Id.* at 268, 106 S.Ct. at 2520 (quoting *id.* at 252, 106 S.Ct. at 2512). Mere speculation cannot stave off a properly supported motion for summary judgment. *See Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985). Rather, to survive a motion for summary judgment, a party may not rest on his pleadings, but must demonstrate that specific, material facts exist that give rise to a genuine issue. *See Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553. As the *Anderson* Court explained, the "mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff," *Anderson,* 477 U.S. at 252, 106 S.Ct. at 2512. We review *de novo* a grant of summary judgment. *See Cooke v. Manufactured Homes, Inc.,* 998 F.2d 1256, 1260 (4th Cir. 1993). We address the claims of interference with the co-use of easements, interference with irrevocable licenses, and interference with easements by estoppel in turn.

## A.

With respect to the interference with the co-use of easements claim, Adelphia contends that the district court erroneously concluded that the utility easements that it co-used did not extend to the interior of the MDUs. According to Adelphia, it held easements accessing the interior of the MDUs through its co-use of easements held by various utility companies servicing the MDUs.[5] Adelphia's co-use of these easements was pursuant to license agreements with the utility companies. According to Adelphia, the language of the instruments granting the utility easements provided that the easements extended to the interior of the MDUs: "Owner grants unto Company ... the perpetual ... easement of a right of way ten (10) feet in width at designated locations ... and ... undesignated locations, ... to lay ... underground conduits and cables ... through and across [the named property], ... the location of such undesignated right of way being at one location to be selected by the Company on each lot shown on such plat and extending from the designated right of way *to the proposed improvements on each such lot.*" (J.A. 159) (emphasis added). Adelphia, therefore, contends the district court erred in granting summary judgment in favor of the Appellees

---

5. Our disposition of this claim makes it unnecessary for us to reach the question of whether Adelphia held easements that were co-extensive with the utility easements through its co-use of those utility easements.

on its interference with the co-use of utility easements claim because the district court improperly concluded that the utility easements did not extend to the interior of the MDUs. We disagree.

■ "An easement ... is a privilege to use the land of another in a particular manner and for a particular purpose. It creates a burden on the servient tract and requires that the owner of that land refrain from interfering with the privilege conferred for the benefit of the dominant tract." *See Brown v. Haley*, 233 Va. 210, 355 S.E.2d 563, 567–68 (1987). "Easements may be created by express grant or reservation, by implication, by estoppel or by prescription." *Bunn v. Offutt*, 216 Va. 681, 222 S.E.2d 522, 525 (1976). If an easement has been created by an express grant, the rights of the parties must be ascertained from the granting language, and the extent of the easement cannot be determined from any other source. *See Hamlin v. Pandapas*, 197 Va. 659, 90 S.E.2d 829, 833 (1956); *see also Louis W. Epstein Family Partnership v. Kmart Corp.*, 13 F.3d 762, 766 (3d Cir.1994) (recognizing that in the case of express easements, the terms of the grant determine the rights and liabilities of the parties). Indeed, if the express language of the grant is not ambiguous, then it controls. *See id.* Therefore, the easements allegedly held by Adelphia through its co-use of the utility easements can extend no further than that permitted in the instruments granting the utility easements.

■ In this case, the district court concluded that the language of the instruments granting the utility easements to the utility companies was clear: the easements did not extend to the interior of the MDUs, but were limited to the exterior. Based on this conclusion, the district court held that Adelphia could not prevail because its claim was based on the Appellees' alleged interference with easements accessing the interior of the MDUs.

We agree with the district court and conclude that the instruments granting the utility easements to the utility companies did not provide Adelphia access to the interiors of the MDUs. Here, the instruments granting the utility easements do not contain language permitting the easements to extend to the interiors of the building structures. The language merely provides that the easements would run "*to* the proposed improvements on each such lot," (J.A. 159) (emphasis added), not *into* the proposed improvements as Adelphia asserts. Moreover, the maps accompanying the instruments show the exact locations of the easements to be exterior to the MDUs. Therefore, assuming without deciding that Adelphia held easements that were co-extensive with the utility easements, we hold that Adelphia could not prevail on its interference with the co-use of easements claim because Adelphia could not access the interiors of the MDUs through those easements. *See Centel Cable Television Co. v. Thos. J. White Dev. Corp.*, 902 F.2d 905, 911, n. 13 (11th Cir.1990) (recognizing that cable operator's installation of cable television wire outside of utility easement can support an action for unlawful trespass); *Central of Ga. Elec. Membership v. Mills*, 196 Ga.App. 882, 397 S.E.2d 137, 138 (1990) (holding that deeds granting two utility easements that clearly specified easements were thirty feet in width and were accompanied by map showing easements' exact location did not give utility company blanket easement across the grantor's land). Accordingly, we affirm the district court's grant of summary judgment in favor of the Appellees on Adelphia's claim that the Appellees interfered with its co-use of utility easements.

### B.

We next turn to the issue of whether the district court properly entered summary judgment on Adelphia's claim that the Appellees tortiously interfered with irrevocable licenses that it held permitting it to provide cable television service to the tenants at the MDUs forever. According to Adelphia, by simply granting Adelphia permission to install the home run systems at the MDUs, an irrevocable license was created, giving Adelphia the right to service forever the tenants at the MDUs through those home run systems. We find no merit to Adelphia's contention.

■ Under Virginia law, a license is a privilege to do one or more acts on another's

land without possessing any interest therein, and therefore a license is revocable by the licensor at any time. *See Bunn v. Offutt,* 216 Va. 681, 222 S.E.2d 522, 525 (1976); *see also* 25 Am.Jur.2d *Easements and Licenses* § 123, at 525 (1966). Because a license is revocable at any time, Virginia law does not recognize a claim for tortious interference with an irrevocable license.[6]

### C.

We now turn to reviewing the district court's grant of summary judgment in favor of the Appellees on Adelphia's interference with easements by estoppel claim. According to Adelphia, the district court erred in not holding that it had met all the elements necessary for the creation of easements by estoppel.

■ An easement may be created by estoppel when proof exists that a party was induced by another to rely on the existence of an easement that did not exist in fact, and the first party did indeed reasonably rely on the existence of the easement to his injury. *See Jones v. Beavers,* 221 Va. 214, 269 S.E.2d 775, 778 (1980).

■ Here, the record reveals that Adelphia failed to offer proof of inducement, reasonable reliance, or injury. With regard to inducement, none was given. The MDU owners did nothing more than consent to Adelphia's installation of its home run systems in the MDUs. With the exception of the exclusive provider agreement between Adelphia and the owner of Four Seasons, which by its express terms expired on September 1, 1991, the MDU owners never promised Adelphia that it could service the

tenants through the home run systems for any agreed length of time. With no inducement, reliance cannot exist. Furthermore, the record shows no injury; Adelphia received cable fees for the entire time it provided cable service to the MDUs and compensatory damages for the time CQC used its home run systems. Because Adelphia failed to meet all the elements necessary to create easements by estoppel, we hold the district court did not err in granting summary judgment in favor of the Appellees on Adelphia's interference with equitable easements claim.

### III.

The Appellees cross-appeal the district court's entry of judgment on the merits in favor of Adelphia on Adelphia's claim that the Appellees had converted its home run systems by tortiously exercising dominion and control over them without its consent. The Appellees contend that prior to the alleged conversion, the home run systems had become fixtures of the MDUs, and thus no longer the personal property of Adelphia. The Appellees contend the factual findings by the district court supporting the district court's conclusion that the home run systems had not become fixtures are clearly erroneous. In urging affirmance, Adelphia contends the findings are not clearly erroneous. Therefore, in addressing the Appellees' assignment of error, the issue before us is whether the district court's factual findings supporting its conclusion that the home run systems had not become fixtures are clearly erroneous.

■ On appeal from a bench trial, we may only set aside findings of fact if they are

---

6. *Buckles-Irvine Coal Co. v. Kennedy Coal Corp.,* 134 Va. 1, 114 S.E. 233 (1922), which Adelphia places great reliance upon, is inapt to this case. In *Buckles,* the Supreme Court of Virginia affirmed the lower court's refusal to enjoin a coal company from using its railroad tracks that ran across certain parcels of land owned by the appellants because the coal company had partly performed parol contracts granting it rights of way across the parcels of land. *Id.,* 114 S.E. at 233–238. A right of way is "an easement, but the term is used to describe either the easement itself or the strip of land which is occupied for the easement." 25 Am.Jur.2d *Easements and Licenses* § 7, at 422 (1966). Therefore, *Buckles*

stands for the proposition that if a property owner grants an *easement* pursuant to a *parol contract* with a third-party, and the third-party partly performs the parol contract, then the property owner may be enjoined from prohibiting the third-party's use of the easement. *Buckles* is inapposite to the instant case because the record before us is conspicuously void of any evidence that the MDU owners orally contracted to grant Adelphia an easement over their respective properties. The record reveals that, at most, the MDU owners granted Adelphia a license to install the home run systems in the MDUs and service the tenants through those systems, and as noted, licenses are revocable at will.

clearly erroneous, and we must give due regard to the opportunity of the district court to judge the credibility of the witnesses. *See* Fed.R.Civ.P. 52(a). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

Under Virginia law, determining whether a particular chattel becomes a fixture or remains personalty involves the weighing of three factors: " '(1) the degree of permanency with which the chattels are annexed to the realty; (2) the adaptation of the chattels to the use or purpose to which the realty is devoted; and (3) the intention of the owner of the chattels to make them a permanent accession to the [property].' " *Multi–Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 553 (4th Cir.1994) (quoting *Lamar Corp. v. City of Richmond*, 241 Va. 346, 402 S.E.2d 31, 34 (1991)). "Of these factors, 'the intention of the party making the annexation is the paramount and controlling consideration.' " *Id.* (quoting *Danville Holding Corp. v. Clement*, 178 Va. 223, 16 S.E.2d 345, 349 (1941)).

In applying these factors in order to conclude whether the home run systems had become fixtures, the district court found: (1) as a matter of fact that the home run systems were annexed to the property with some degree of permanency but not so much that they could not be easily removed; (2) as a matter of law that the home run systems were not adaptable to the use or purpose of the MDUs, *see Multi-Channel TV Cable Co.*, 22 F.3d at 554; and (3) as a matter of fact that Adelphia did not intend to make the home run systems permanent accessions to the MDUs.

After carefully reviewing all the relevant evidence, we conclude that the factual findings of the district court are not clearly erroneous. With respect to the district court's finding regarding the degree of annexation, the district court made this finding after personally inspecting the home run systems at several of the MDUs. We are, of course, extremely reluctant to reverse a district court's finding made after personal observation. *See Jiminez v. Mary Washington College*, 57 F.3d 369, 379 (4th Cir.1995) (stating that reviewing courts tread "gingerly" in reviewing factual findings because they do not have the benefit of being at the trial). With respect to the district court's finding on the issue of Adelphia's intent, the record contains the testimony of Joseph Price, the Adelphia employee responsible for negotiating the installations of the home run systems at the MDUs in 1981, stating that at the time Adelphia installed the home run systems, it did not intend to remove them. Despite this testimony, the record contains absolutely no evidence that Adelphia transferred ownership of the home run systems to anyone at the time of the installations. Furthermore, the record contains abundant evidence that Adelphia was solely responsible for the service and maintenance of the home run systems at the MDUs, evidencing Adelphia's intent not to make the home run systems permanent accessions to the realty. Given the conflicting nature of the evidence in the record, we cannot reverse the district court's finding as clearly erroneous. *See Anderson v. Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (stating that "[if] the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently"). Finding no merit in the Appellees' challenge to the district court's findings, we affirm the district court's entry of judgment in favor of Adelphia on its conversion claim. *See Multi–Channel TV Cable Co.*, 22 F.3d at 553–54 (analyzing nearly identical set of facts in context of determining likelihood of success on the merits for purposes of reviewing the grant of a preliminary injunction and concluding that the evidence suggested the home run systems were not fixtures).

## IV.

In their cross-appeal, the MDU owners continue to press their constitutional reg-

ulatory takings challenge to Virginia Code section 55–248.13:2, which is the provision of the VRLTA that prohibits a landlord from demanding or accepting payment of any kind from a provider of cable television service "in exchange for giving the tenants of such landlord access to such service ...," Va.Code Ann. § 55–248.13:2 (Michie 1986).[7] Contending they have a right to obtain compensation in exchange for allowing a cable provider to employ their land in "accessing" tenants, the MDU owners argue that Virginia Code section 55–248.13:2 deprives them of that right without just compensation in violation of the Fifth and Fourteenth Amendments to the United States Constitution. We review a constitutional challenge to a statute *de novo.* See *Johnston v. Cigna Corp.,* 14 F.3d 486, 489 (10th Cir.1993), *cert. denied,* — U.S. ——, 115 S.Ct. 1792, 131 L.Ed.2d 720 (1995).

 The Fifth Amendment provides that private property may not be "taken" by the federal government without just compensation, U.S. Const. amend. V. This prohibition equally applies to the States through the Fourteenth Amendment, *see Chicago Burlington and Quincy R.R. Co. v. City of Chicago,* 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897). Takings jurisprudence has recognized that a taking may occur through physical invasion or regulation. *See Lucas v. South Carolina Coastal Council,* — U.S. ——, ——–——, 112 S.Ct. 2886, 2892–93, 120 L.Ed.2d 798 (1992). This case squarely raises a regulatory takings claim; it is there that we will focus.

 In *Lucas,* the Supreme Court surveyed its regulatory takings jurisprudence and stated that in "70–odd years" of such jurisprudence, "we have generally eschewed any set formula for determining how far is too far, preferring to engag[e] in ... essentially ad hoc, factual inquires." *Id.* at ——, 112 S.Ct. at 2893 (internal quotation marks omitted) (alteration in original). Although the Supreme Court itself has recognized that

no reliable test exists for distinguishing a taking from a regulation, *see, e.g., Keystone Bituminous Coal Assn. v. DeBenedictis,* 480 U.S. 470, 473–74, 107 S.Ct. 1232, 1236, 94 L.Ed.2d 472 (1987) (emphasizing that takings decisions can be reached only after examination of "the particular facts"), several factors have been regularly considered by the Court as particularly significant, and include the following: (1) the character of the governmental regulation, *see, e.g., Lucas,* — U.S. at ——, 112 S.Ct. at 2893 (one "discrete categor[y]" of actions regularly held to be a taking are "regulations that compel the property owner to suffer a physical 'invasion' of his property"); (2) whether the regulation has deprived the property owner of all economically viable uses of his property, *see, e.g., id.* at ——, 112 S. Ct. at 2893 (second discrete category of *per se* regulatory taking is where "regulation denies all economically beneficial or productive use of land"); (3) whether the regulation has deprived the owner of his reasonable investment-backed expectations, *see, e.g., id.* at —— n.8, 112 S.Ct. at 2895 n.8 ("as we have acknowledged time and again, '[t]he economic impact of the regulation on the claimant and ... the extent to which the regulation has interfered with distinct investment-backed expectations' are keenly relevant to takings analysis generally"); and (4) whether the regulation substantially advances a legitimate state interest, *see, e.g., id.* at ——, 112 S.Ct. at 2897 ("land-use regulation does not effect a taking if it substantially advance[s] legitimate state interests") (internal quotation marks omitted).

 We now turn to the application of these factors to the facts in the case before us. With respect to the character of Virginia Code section 55–248.13:2, it merely prohibits a use of the property, not a physical invasion, thus the regulation at issue is drastically less offensive than a physical taking. With respect to the second factor, far from denying

7. Virginia Code section 55–248.13:2 provides in pertinent part:
 No landlord shall demand or accept payment of any fee, charge or other thing of value from any provider of cable television service, satellite master antenna television service, direct broadcast satellite television service, subscrip-

tion television service or service of any other television programming system *in exchange for giving the tenants of such landlord access to such service;* and no landlord shall demand or accept any such payment from any tenants in exchange therefore unless the landlord is itself the provider of the service.

the MDU owners all economically viable use of their land, Virginia Code section 55–248.13:2 merely prohibits a use (i.e., accepting fees in the nature of kickbacks for providing nothing more than access to their tenants) from which the MDU owners may derive a minimal income in relation to the greater income they may derive from leasing individual units. With respect to the third factor, it would strain credulity to find that the statute's prohibition against deriving income from the allowance of cable television providers to service the MDU tenants deprived each MDU owner of its reasonable investment-backed expectations. Indeed, there is no evidence in the record to suggest that at the time the MDU owners purchased their respective properties, they expected to derive income from allowing cable television providers access to their tenants; from all accounts, the reasonable investment-backed expectations of the MDU owners were traditional, for example, the collection of rent from unit tenants and future appreciation. Finally, with respect to the fourth factor, Virginia Code section 55–248.13:2 presumably advances the state's interest in preventing an unfair competitive market for cable television providers. Such an unfair market not only disadvantages competing cable providers, but disadvantages the MDU tenants in the form of cable service fees not regulated by the natural forces of competition.

Virginia Code section 55–248.13:2 does nothing more than prohibit a kickback arrangement whereby landlords are prohibited from receiving compensation merely for providing "access" to their tenants. Significantly, the MDU owners have not related the twelve percent kickback they received from CQC to any service they provided CQC. In view of the outcome of our application of the stated factors, we conclude Virginia Code section 55–248.13:2 does not amount to a regulatory taking of the MDU owners' property. Accordingly, we reject the MDU owners' constitutional challenge to Virginia Code section 55–248.13:2.[8]

## V.

The district court awarded Adelphia the lump sum of $219,887 in compensatory damages for both Adelphia's claims of tortious interference with existing and prospective contractual relationships and violation of the VRLTA, apportioning the lump sum as follows: $28,300 for lost profits from existing subscriptions and $191,594 for lost profits from prospective subscriptions. The Appellees challenge the $191,594 awarded for Adelphia's lost profits from prospective subscriptions as excessive. Specifically, the Appellees contend the eleven-year period for which prospective lost profits were awarded was too speculative.[9]

If a defendant is liable for tortious interference with a plaintiff's prospective contractual relationships, the proper measure of the plaintiff's damages is the present value of lost profits resulting from the defendant's actions. See H.J., Inc. v. International Tel. & Tel. Corp., 867 F.2d 1531, 1549 (8th Cir.1989); Restatement (Second) of Torts, § 774A(1)(a)–(b) (1979). In order to recover lost profits, Adelphia was not required to prove the amount of its damages with mathematical precision, Commercial Business Systems v. BellSouth Servs., 249 Va. 39, 453 S.E.2d 261, 268 (1995); rather, it was only required to produce sufficient facts and circumstances that would permit a trier of fact "to make an intelligent and

---

**8.** The MDU owners heavily rely on FCC v. Florida Power Corp., 480 U.S. 245, 107 S.Ct. 1107, 94 L.Ed.2d 282 (1987), in support of their takings challenge, but we find this case inapt to our analysis. Florida Power involved a takings challenge to an order of the Federal Communications Commission under the Pole Attachments Act, see 47 U.S.C.A. § 224 (West 1991 and West Supp. 1995), setting the maximum rate that a particular utility could charge cable television companies for attaching their cable wires to its poles. The statute at issue in the case before us prohibits a particular use of the MDU owners' property, and has nothing to do with the setting of a maximum rate for renting space on the property. Accordingly, it is best analyzed under the factors we have set forth.

**9.** Because the district court did not award additional damages for violation of the VRLTA in addition to its award of damages for the tortious interference with existing and prospective contractual relationships, our resolution of the propriety of the latter is dispositive of the Appellees' challenge to the award as excessive.

*reasonable estimate* of the amount," *id.* (emphasis added). Here, the Appellees face an extraordinary burden in mounting their challenge because we will not set aside an award of compensatory damages as excessive unless it is " 'against the clear weight of the evidence, or is based upon evidence which is false, or will result in a miscarriage of justice.' " *Johnson v. Parrish,* 827 F.2d 988, 991 (4th Cir.1987) (quoting *Aetna Casualty & Sur. Co. v. Yeatts,* 122 F.2d 350, 352 (4th Cir.1941)).

In the case before us, each side presented expert testimony regarding the amount of Adelphia's lost profits resulting from Appellees' tortious interference with Adelphia's prospective subscriptions from the tenants at the MDUs. John Kane (Kane), an appraiser, financial analyst, and management consultant with experience in the cable television industry, testified on behalf of Adelphia. Kane appraised Adelphia's lost profits from the Appellees' interference with its prospective subscriptions at $818,700, which covered an eleven-year period. In reaching this figure, Kane estimated that seventy-five percent of the tenants at the MDUs involved in this litigation would, by the end of the eleven years, subscribe to cable television. Kane based this percentage on a comparison between the percentage of cable subscribers at all the MDUs that Adelphia serviced as of June 1992, approximately sixty-eight percent, and the percentage of cable subscribers at MDUs across the United States in cities akin to Charlottesville's limited off-air reception of major networks, eighty percent. Kane testified that he derived the eleven-year time period by adding the six remaining years on Adelphia's franchise agreement with the City of Charlottesville with the five years for which Charlottesville, in Kane's opinion, would renew Adelphia's franchise agreement. Kane's appraisal assumed that Adelphia would not have faced any competition because, in Kane's opinion, the MDU owners would not have permitted two cable operators to service the MDUs, and other operators would not have found it economically feasible to compete with Adelphia.

■ Donald Martin (Martin) testified as an expert in economics for the Appellees. First, Martin opined that Adelphia had not lost any profits as the result of the Appellees'

interference with its prospective subscriptions at the MDUs because the MDU owners had the legal right to exclude Adelphia from the MDUs at any time, thus terminating Adelphia's access to the tenants. Second, Martin critiqued the economic basis of Kane's appraisal: Martin found Kane's basic methodology sound, but believed Kane's figures were inflated primarily due to his failure to take into account competition. Accordingly, Martin substituted figures that accounted for competition for Kane's figures that did not account for competition into Kane's appraisal model and arrived at a low estimate of $174,334 and a high estimate of $191,594 for the present value of Adelphia's lost profits over an eleven-year period. Based on Martin's testimony, the Appellees moved for admission of defendants' exhibit forty which is a chart listing Martin's calculations in arriving at his estimates.

In rejecting both Kane's appraisal for its failure to take competition into account and Martin's zero damages theory for its dubiousness, and awarding Adelphia $191,594 in lost profits from prospective subscriptions, the district court reasoned:

I think the competition model really reflects the true damages in this case. The high end, $28,302 for existing; $191,594 for future. . . . I honestly believe as a trier of fact that the competition model expresses the losses more accurately that would have resulted as a direct and approximate result of the conduct of the defendants . . . for tortious interference.

(J.A. 2892–93).

Based on the evidence before the district court, we cannot conclude that the award of $191,594 for lost profits from prospective subscriptions is " 'against the clear weight of the evidence,' " *Johnson,* 827 F.2d at 991 (quoting *Aetna Casualty & Surety Co.,* 122 F.2d at 352), as the Appellees necessarily contend. Indeed, we are astounded by the Appellees' bold challenge to this award as excessive because the district court expressly relied on the figure provided by the Appellees' own expert. As far as the eleven-year period for which prospective profits were awarded, we cannot say that the six years remaining on Adelphia's franchise or Kane's expert opinion that Adelphia would very likely be able to renew its franchise for another

five years creates a time period too speculative for a trier of fact to award damages. Accordingly, we affirm the district court's compensatory damage award for lost profits from prospective subscriptions.

### VI.

In conclusion, we hold the district court properly entered summary judgment in favor of the Appellees on Adelphia's interference with the co-use of easements claim, interference with irrevocable licenses claim, and interference with easements by estoppel claim, and properly entered judgment in favor of Adelphia on its conversion claim. In addition, we hold § 55–248.13:2 of VRLTA does not amount to an unconstitutional taking of private property without just compensation. Finally, we hold the damages awarded by the district court are not excessive. We have reviewed all the remaining assignments of error asserted by the parties and find them to be without merit. Accordingly, we affirm the judgment of the district court in all respects.[10]

*AFFIRMED.*

---

**10.** We grant Appellees' motion for leave to file attachment five to their Reply Brief.