**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

INDUSTRIAL TURNAROUND
CORPORATION;
ELECTRICAL/MECHANICAL SERVICES,
INCORPORATED,

Petitioners,

v.

NATIONAL LABOR RELATIONS BOARD,
Respondent.

No. 96-1783

NATIONAL LABOR RELATIONS BOARD,
Petitioner,

v.

INDUSTRIAL TURNAROUND

CORPORATION;
ELECTRICAL/MECHANICAL SERVICE,
INCORPORATED,
Respondents.

No. 96-1926

On Petition for Review and Cross-Application for
Enforcement of an Order of the
National Labor Relations Board.
(5-CA-23392, 5-CA-23915)

Argued: January 30, 1997

Decided: May 30, 1997

Before LUTTIG and WILLIAMS, Circuit Judges, and
CLARKE, Senior United States District Judge for the
Eastern District of Virginia, sitting by designation.

_____

Petition for review granted in part and denied in part. Petition for enforcement granted in part and denied in part, and remanded by published opinion. Judge Williams wrote the opinion, in which Judge Luttig and Senior Judge Clarke joined.

_____

**COUNSEL**

**ARGUED:** David Raymond Simonsen, Jr., Richmond, Virginia, for Petitioners. Linda S. Neighborgall, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent. **ON BRIEF:** Frederick L. Feinstein, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, Linda Dreeben, Supervisory Attorney, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent.

_____

**OPINION**

WILLIAMS, Circuit Judge:

Industrial TurnAround Corporation (ITAC), an electrical construction firm, petitions for review of a decision and order of the National Labor Relations Board (NLRB) finding that ITAC and its alter ego, Electrical/Mechanical Services, Inc. (EMSI), violated § 8(a)(1), (a)(3), and (a)(5) of the National Labor Relations Act (the Act), see 29 U.S.C.A. § 158(a)(1), (a)(3), & (a)(5) (West 1973 & Supp. 1997), by refusing to abide by a collective-bargaining agreement negotiated on ITAC's behalf by the Virginia Chapter of the National Electrical Contractors Association (NECA). The NLRB cross-petitions for enforcement of its decision and order. For the reasons that follow, we conclude that ITAC and EMSI were alter egos, and that the companies violated § 8(a)(1), (a)(3), and (a)(5) of the Act. We also conclude, however, that the NLRB abused its discretion in ordering the remedy in this case. Accordingly, we grant in part and deny in part ITAC's petition for review, grant in part and deny in part the NLRB's cross-petition for enforcement, and remand the case to the NLRB for the entry of an appropriate remedial order.

2

I.

On April 2, 1990, ITAC President Sidney Harrison executed a letter of assent designating NECA as ITAC's "collective bargaining representative for all matters contained in or pertaining to the current and any subsequent approved INSIDE CONSTRUCTION labor agreement between [NECA] and [the International Brotherhood of Electrical Workers, Local 666, AFL-CIO (the Union)]." (J.A. at 316.) By its terms, the letter of assent was to remain in effect until terminated by ITAC's "giving written notice to [NECA] and to the Local Union at least one hundred fifty (150) days prior to the then current anniversary date of the applicable approved labor agreement." (J.A. at 316.) At the time the letter of assent was executed, a collective-bargaining agreement between NECA and the Union was in force until August 31, 1992.

On August 31, 1992, when the 1990-92 agreement expired, the parties had not completed negotiations for a successor agreement. During the fall of 1992, while negotiations for a new agreement were underway, ITAC continued to comply with the 1990-92 agreement, paying wages specified in the expired agreement and collecting and remitting to the Union employee-authorized payroll deductions for Union dues and benefit funds.

On November 9, 1992, Harrison incorporated EMSI as a nonunion company performing electrical construction and pipefitting work. Harrison's primary purpose for establishing EMSI was to "get around" ITAC's union contract. Harrison's wife, Glenn, was the sole shareholder of EMSI. Her $100,000 investment in the company was made up of funds supplied to her by Harrison, who withdrew them from ITAC bank accounts and directed their deposit into an EMSI account.

ITAC stopped bidding on electrical construction jobs in November 1992. At that time, the company's outstanding electrical construction work was transferred to EMSI. During 1993, over 70 percent of EMSI's electrical projects were performed either directly for or under subcontract to ITAC, or for ITAC's former customers. ITAC was responsible for over 45 percent of EMSI's total sales during 1993. ITAC and EMSI shared a business address and premises, furnishings,

3

tools, equipment, and trucks. The companies also used the same suppliers of accounting, insurance, and banking services. Sidney Harrison controlled both ITAC and EMSI.

In late 1992, ITAC informed its two remaining employees, John Perkins and David Deane, that ITAC had run out of electrical construction work and did not intend to bid for more, and asked them whether they would work at EMSI, a nonunion shop. Both declined. Beginning in November 1992 and continuing through 1993, EMSI hired electrical workers. During this time, EMSI told five employment applicants who wore union insignias or whose applications revealed prior employment with union contractors that it was not hiring. At one employment interview, an EMSI representative asked an applicant, "Are you Union?" (J.A. at 54.)

Finally, on January 25, 1993, NECA and the Union reached agreement and signed the 1992-94 successor agreement. The 1992-94 agreement, effective retroactively to September 1, 1992, required signatories to obtain unit employees from the Union's hiring hall. On May 6, 1993, ITAC notified NECA and the Union that effective immediately it was terminating its letter of assent, revoking its grant of bargaining authority to NECA, and repudiating the 1992-94 agreement.

On March 19 and September 20, 1993, the Union filed charges against ITAC, alleging that ITAC and EMSI were alter egos and that the companies had violated § 8(a)(1), (a)(3), and (a)(5) of the Act. The case was heard by an Administrative Law Judge (ALJ) on June 21-24, and August 8-10, 1994. The ALJ concluded that ITAC had violated § 8(a)(5) of the Act by creating EMSI as an alter ego and by repudiating the 1992-94 agreement. Additionally, the ALJ determined that ITAC and EMSI violated § 8(a)(1) and (a)(3) of the Act by interrogating a job applicant concerning his Union affiliation, by constructively discharging employees John Perkins and David Deane because they balked at working for a nonunion company, and by refusing to hire job applicants Thomas Dagrosa, Dudley Ledford, Robert Burks, George Harris, and Ernest Kelley because of their affiliation with the Union.

The ALJ recommended an extensive remedy, ordering that ITAC cease and desist from engaging in unfair labor practices; make whole

4

applicants, employees, and various employee trust funds; and comply with the 1992-94 collective-bargaining agreement. The remedy was premised on the ALJ's finding that "[f]or the period September 1, 1992 through August 31, 1994, the Union was the exclusive bargaining representative of the employees in the appropriate unit within the meaning of Section 9(a) of the Act." (J.A. at 506.) The NLRB adopted the recommended order of the ALJ with no substantial modifications. ITAC appeals.

II.

The NLRB's findings of fact are "conclusive" if supported by "substantial evidence on the record considered as a whole." 29 U.S.C.A. § 160(e) (West 1973); accord AMF Bowling Co. v. NLRB, 63 F.3d 1293, 1301 (4th Cir. 1995) (citing Universal Camera Corp. v. NLRB, 340 U.S. 474, 493 (1951)). Although we ordinarily review questions of law de novo, the NLRB's interpretation of the Act is entitled to deference if it is reasonably defensible. See Holly Farms Corp. v. NLRB, 116 S. Ct. 1396, 1406 (1996); NLRB v. Iron Workers, 434 U.S. 335, 341, 350-51 (1978).

A.

The ALJ determined that ITAC and EMSI both performed electrical construction work in central and southeastern Virginia, that EMSI completed jobs begun by ITAC, and that EMSI functioned as ITAC's favored subcontractor and "construction arm." EMSI, the ALJ found, began operations in ITAC's office and electrical shop, and thereafter the two companies shared a business address and premises. EMSI used ITAC's tools and equipment without charge, and, throughout 1993, ITAC paid EMSI's expenses for trucks and insurance. In addition, the ALJ determined that the two companies shared the same management and supervision: Aaron Gay and Bill Knight managed the day-to-day electrical construction operations of both companies under the direction of Sidney Harrison, who controlled both companies.

The ALJ also determined that an EMSI representative asked a job applicant if he was a member of the Union, that ITAC laid off Perkins and Deane after they made it clear that they were not interested in

5

working for a nonunion company, and that EMSI refused to hire job applicants who were affiliated with the Union. These factual findings were adopted in full by the NLRB, are supported by substantial evidence, and are not contradicted by any evidence offered by ITAC. See 29 U.S.C.A. § 160(e); AMF Bowling, 63 F.3d at 1301. Indeed, ITAC does not challenge these findings on appeal.

Because EMSI was created as the alter ego of ITAC, EMSI "is in reality the same employer and is subject to all the legal and contractual obligations of [ITAC]." Howard Johnson Co. v. Detroit Local Joint Executive Bd., 417 U.S. 249, 259 n.5 (1974). Thus, if ITAC was subject to the terms of the 1992-94 collective-bargaining agreement between NECA and the Union, then EMSI also was subject to the terms of, and is liable for failing to comply with, that agreement. See Alkire v. NLRB, 716 F.2d 1014, 1018 (4th Cir. 1983) ("If alter ego status is imposed upon the two entities, the labor obligations of the original employer will be carried over to the subsequent entity, and both will be held liable for any violation of these duties by either employer.").

B.

Not surprisingly, ITAC contends that it was not subject to the terms of the 1992-94 collective-bargaining agreement during the time that it incorporated EMSI and refused to employ Union electrical workers. The company argues that no § 8(f) collective-bargaining agreement existed between September 1, 1992, when the 1990-92 agreement expired, and January 25, 1993, when NECA and the Union entered into the 1992-94 agreement. Because no § 8(f) agreement existed, ITAC argues, "EMSI was free to set any terms and conditions of employment it desired; EMSI could have no duty to bargain with the Union during any period in which no 8(f) agreement existed." (Petitioners' Br. at 15.)

Section 8(f) allows employers or multi-employer associations in the construction industry to enter into collective-bargaining agreements, commonly called "pre-hire agreements," with unions that have not formally established majority status. See 29 U.S.C.A. § 158(f) (West 1973). Moreover, an individual construction employer can voluntarily execute a letter of assent, by which the individual employer

6

authorizes a multi-employer bargaining association to represent it in § 8(f) negotiations. In such an arrangement, the individual employer agrees to be bound by the § 8(f) agreement reached between the multi-employer bargaining association and the union.

On April 2, 1990, ITAC President Sidney Harrison executed just such a letter of assent, thereby binding ITAC to the then current 1990-92 agreement and to all successor agreements. The letter of assent provides in relevant part:

> [T]he undersigned firm does hereby authorize [NECA] as its collective bargaining representative for all matters contained in or pertaining to the current and any subsequent approved INSIDE CONSTRUCTION labor agreement between [NECA] and [the Union]. . . . This authorization, in compliance with the current approved labor agreement, shall become effective on the 2nd day of April, 1990. It shall remain in effect until terminated by the undersigned employer giving written notice to [NECA] and to [the Union] at least one hundred fifty (150) days prior to the then current anniversary date of the applicable approved labor agreement.

(J.A. at 316 (emphasis added).) By its terms, the letter of assent authorized NECA to bargain on ITAC's behalf and provided that the authorization would continue unless ITAC withdrew the authorization in writing at least 150 days prior to the anniversary date of the applicable § 8(f) agreement. During the time ITAC incorporated EMSI and refused to hire Union electrical workers, the company made no attempt to revoke the letter of assent designating NECA as its collective-bargaining agent.

Acting on ITAC's behalf pursuant to the letter of assent, NECA negotiated the 1992-94 collective-bargaining agreement. The agreement was signed on January 25, 1993, and was expressly made retroactive to September 1, 1992. Because ITAC made no attempt to revoke the letter of assent prior to January 25, 1993, we conclude that the company was subject to the terms of the 1992-94 collective-bargaining agreement as negotiated by its authorized bargaining agent and the Union.[1]

_____
[1] The NLRB determined that ITAC, in addition to being bound by the 1992-94 agreement by virtue of its unrevoked letter of assent, was bound

7

ITAC contends that even if it was bound by the 1992-94 agreement by virtue of its unrevoked letter of assent, the NLRB erred in ordering it to comply with the agreement because the agreement was unenforceable. The agreement was unenforceable, ITAC claims, because it impermissibly included in the bargaining unit "foremen" and "general foremen," who, according to the company, are supervisors as defined in § 2(11) of the Act, see 29 U.S.C.A. § 152(11) (West 1973). Under the Act, "no employer . . . shall be compelled to deem individuals defined herein as supervisors as employees for the purpose of any law . . . relating to collective bargaining." 29 U.S.C.A. § 164(a) (West 1978). By finding appropriate a unit that included supervisors, the company contends, the Board violated its duty to determine an "appropriate unit." 29 U.S.C.A. § 159(b) (West 1973).

It was NECA, however, ITAC's authorized bargaining agent pursuant to the letter of assent, who negotiated the 1992-94 collective-bargaining agreement which ITAC contends improperly included supervisors in the appropriate bargaining unit. The NLRB has held that "when parties to a collective-bargaining relationship, as here, have voluntarily agreed to include supervisors in a unit, the Board will order the application of the terms of the collective-bargaining agreement to those supervisors." Gratiot Community Hosp., 312 N.L.R.B. 1075, 1075 n.2 (1993), enforced in part , 51 F.3d 1255 (6th Cir. 1995); see also Plaza Hotel & Casino, 296 N.L.R.B. 918, 918 n.4 (1989), enforced sub nom. E.G. & H., Inc. v. NLRB, 949 F.2d 276 (9th Cir. 1991). The NLRB's interpretation of the Act in this respect is reasonably defensible. See Holly Farms Corp. v. NLRB, 116 S. Ct. 1396, 1406 (1996). Accordingly, we conclude that the 1992-94 collective-bargaining agreement was not unenforceable for the reason that it included foremen and general foremen in the bargaining unit. Therefore, we must conclude, as did the NLRB, that because ITAC

_____

by the agreement by virtue of an "evergreen" clause in the 1990-92 agreement, which continued in effect the terms of the 1990-92 agreement until negotiations for a successor agreement could be completed. ITAC contends that this determination is not supported by substantial evidence because the 1990-92 agreement was not included in the record. Given our holding that ITAC was bound by the 1992-94 agreement by virtue of its unrevoked letter of assent, we have no occasion to pass upon this issue.

was subject to the terms of the 1992-94 agreement, ITAC's incorporation of EMSI and its subsequent refusal to employ Union electrical workers violated § 8(a)(1), (a)(3), and (a)(5) of the Act.

III.

On May 6, 1993, ITAC notified NECA and the Union in writing that it was revoking the letter of assent and repudiating the 1992-94 collective-bargaining agreement. The ALJ, citing John Deklewa & Sons, Inc., 282 N.L.R.B. 1375 (1987), enforced sub nom. International Ass'n of Bridge, Structural & Ornamental Iron Workers v. NLRB, 843 F.2d 770 (3rd Cir. 1988) ("Deklewa"), concluded that ITAC's "May 6, 1993 repudiation of the collective bargaining agreement violated Section 8(a)(5) of the Act," and held that "the terms of that agreement were binding on EMSI from the time it commenced operations until August 31, 1994" (J.A. at 503). Based on this conclusion, the ALJ fashioned a remedy that required, inter alia, that ITAC and EMSI reimburse employees, applicants, and employee trust funds for the period September 1, 1992 through August 31, 1994. The NLRB, in its decision and order, adopted the remedy ordered by the ALJ.

In Deklewa, the NLRB overruled a number of its prior decisions and held that § 8(f) collective-bargaining agreements may not be unilaterally repudiated by employers or unions. Prior to Deklewa, the NLRB had held that a § 8(f) agreement could be terminated by unilateral repudiation, either by the employer or the union, so long as the union had not achieved majority status. See, e.g., R.J. Smith Constr. Co., 191 N.L.R.B. 693 (1971), enforcement denied sub nom. Local No. 150, Int'l Union of Operating Engineers v. NLRB , 480 F.2d 1186 (D.C. Cir. 1973). This pre-Deklewa interpretation of § 8(f) was approved by the Supreme Court, see, e.g., Jim McNeff, Inc. v. Todd, 461 U.S. 260, 269-70 (1983), and by our Circuit, see Clark v. Ryan, 818 F.2d 1102, 1106-07 (4th Cir. 1987). In Deklewa, however, the NLRB reversed its course and held that "[w]hen parties enter into an 8(f) agreement, they will be required . . . to comply with that agreement unless the employees vote, in a Board-conducted election, to reject (decertify) or change their bargaining representative." 282 N.L.R.B. 1375, 1987 WL 90249, at *14. Several Circuits have fol-

9

lowed the lead of the Third Circuit, which enforced Deklewa, and have adopted this new interpretation of § 8(f).**2**

In determining that ITAC's repudiation of the 1992-94 collective-bargaining agreement violated Section 8(a)(5) of the Act, and that the terms of the 1992-94 agreement were binding on EMSI from the time it commenced operations until August 31, 1994, the ALJ (and the NLRB) apparently assumed that Deklewa was the controlling law of this Circuit. Deklewa, however, does not control in the Fourth Circuit. We recognize that several Circuits have deemed the NLRB's current interpretation of § 8(f) to be reasonable and have adopted Deklewa. We emphasize, however, that federal agencies, including the NLRB, are "required to abide by the law of this Circuit in matters arising within the jurisdiction of this court, until and unless it is changed by this court or reversed by the Supreme Court of the United States." See United States Dep't of Energy v. FLRA, 106 F.3d 1158, 1165 (4th Cir. 1997) (Luttig, J., concurring).

We are precluded from adopting Deklewa as the law of the Circuit because it stands in conflict with Clark v. Ryan , 818 F.2d 1102 (4th Cir. 1987), a prior panel opinion of this court. In Clark, we unequivocally held -- contrary to Deklewa -- that "a pre-hire agreement may be repudiated at any time by either party prior to the union's achievement of majority status." Clark, 818 F.2d at 1107. In reaching this conclusion, we relied on the Supreme Court's decision in Jim McNeff, Inc. v. Todd, 461 U.S. 260, 269-70 (1983), which itself held that § 8(f) agreements are subject to repudiation until the union establishes majority status in a § 9(a) election. Neither McNeff nor Clark dis-

_____

**2** The Courts of Appeals for the First, Seventh, Eighth, Ninth, and Tenth Circuits have adopted Deklewa as a reasonable construction of the Act. See NLRB v. Viola Indus.-Elevator Div., Inc., 979 F.2d 1384, 1393-95 (10th Cir. 1992) (en banc); C.E.K. Indus. Mechanical Contractors, Inc. v. NLRB, 921 F.2d 350, 357 (1st Cir. 1990); NLRB v. Bufco Corp., 899 F.2d 608, 609, 611 (7th Cir. 1990); NLRB v. W.L. Miller Co., 871 F.2d 745, 748 (8th Cir. 1989); Mesa Verde Constr. Co. v. Northern California Dist. Council of Laborers, 861 F.2d 1124, 1129-34 (9th Cir. 1988) (en banc). The Fifth Circuit, in United Brotherhood of Carpenters and Joiners Local Union 953 v. Mar-Len of Louisiana, Inc., 906 F.2d 200 (5th Cir. 1990), declined to decide "whether the NLRB's present interpretation of § 8(f), announced in Deklewa , is the controlling law in this circuit." Id. at 203.

10

cussed the deference due to the NLRB's interpretation of the Act, nor did those opinions reason that the Board's pre-Deklewa construction of § 8(f) was merely a defensible interpretation of the Act subject to change.

"A decision of a panel of this court becomes the law of the circuit and is binding on other panels unless it is overruled by a subsequent en banc opinion of this court or `a superseding contrary decision of the Supreme Court.'" Etheridge v. Norfolk & Western Ry. Co., 9 F.3d 1087, 1090 (4th Cir. 1993) (quoting Busby v. Crown Supply, Inc., 896 F.2d 833, 840-41 (4th Cir. 1990)); see also Jones v. Angelone, 94 F.3d 900, 905 (4th Cir. 1996) ("[W]e cannot, as a panel of the court, overrule the decision of another panel; only the en banc court may overrule a prior panel decision."); Capital Produce Co. v. United States, 930 F.2d 1077, 1079 (4th Cir. 1991) (holding that a prior panel decision "is immune from attack at the panel level"). Because the Fourth Circuit has not adopted Deklewa, and because we are bound by a prior panel decision, we analyze ITAC's repudiation of the 1992-94 agreement under Clark, 818 F.2d at 1102. Panels of the Ninth and Eleventh Circuits have similarly refused to adopt Deklewa in the face of contrary Circuit precedent. See Local Union 48 Sheet Metal Workers v. S.L. Pappas & Co., 106 F.3d 970, 975 (11th Cir. 1997) (declining to adopt Deklewa because of contrary prior panel decision); Mesa Verde Constr. Co. v. Northern California Dist. Council of Laborers, 820 F.2d 1006, 1013 (9th Cir.) (same), withdrawn , 832 F.2d 1164 (9th Cir. 1987), reheard en banc, 861 F.2d 1124 (9th Cir. 1988) (adopting Deklewa); cf. United Brotherhood of Carpenters and Joiners Local Union 953 v. Mar-Len of Louisiana, Inc. , 906 F.2d 200, 203 n.2 (5th Cir. 1990) (declining to decide whether"we are bound by the precedent of prior panels . . . that have expressly affirmed the NLRB's pre-Deklewa interpretation of § 8(f)").

In Clark, we held that a § 8(f) agreement may be repudiated at any time by either party prior to the union's achievement of majority status. Here, it is not disputed that the Union did not establish majority status. Because a § 8(f) pre-hire agreement is voidable by repudiation until the union establishes majority support, and because it is undisputed that the Union has never achieved majority status, ITAC had the right to repudiate the § 8(f) 1992-94 collective-bargaining agreement.

11

ITAC notified NECA and the Union by letter dated May 6, 1993, that it was terminating the letter of assent and repudiating the collective-bargaining agreement effective immediately. In clear terms, the letter stated that as of May 6, 1993, NECA was no longer the labor-negotiating agent for ITAC. An employer may repudiate a § 8(f) agreement by "providing notice to the union." Clark, 818 F.2d at 1107; see also McNeff, 461 U.S. at 270 n.11 (suggesting that "sending notice to the union" would bring about the repudiation of a § 8(f) agreement). We therefore hold that the letter from ITAC to NECA and the Union operated as an effective repudiation of the 1992-94 collective-bargaining agreement.

ITAC's letter operated as an effective repudiation, even though it did not comply with the termination provision in the letter of assent, which provided that termination could be effectuated only by ITAC's "giving written notice to [NECA] and to the Local Union at least one hundred fifty (150) days prior to the then current anniversary date of the applicable approved labor agreement." (J.A. at 316.) ITAC's letter was dated May 6, 1993, only 112 days prior to August 31, 1993, the then-current anniversary date of the 1992-94 agreement. Our decision in Clark, however, makes clear that an employer's notification of repudiation need not comply with the termination provision of the agreement "if the agreement is a pre-hire agreement under section 8(f)." 818 F.2d at 1106. Accordingly, we hold that ITAC's obligations under the 1992-94 agreement, along with those of its alter ego EMSI, came to an end on May 6, 1993, the day it provided notice of repudiation to NECA and the Union.

IV.

The NLRB's remedial order was grounded on the ALJ's conclusion that Deklewa controlled in this Circuit and that the companies' labor obligations continued under the 1992-94 collective-bargaining agreement through August 31, 1994. "The Board has broad discretion to choose a remedy," NLRB v. Williams Enters., Inc., 50 F.3d 1280, 1289 (4th Cir. 1995), "provided that the choice made does not rest on insubstantial evidence or erroneous legal standards and does not constitute an abuse of discretion," Standard-Coosa-Thatcher Carpet Yarn Div., Inc. v. NLRB, 691 F.2d 1133, 1144 (4th Cir. 1982) (citing NLRB v. Gissel Packing Co., 395 U.S. 575, 612 n.32 (1969)). Because the NLRB determined that ITAC's obligations under the § 8(f) agreement

12

extended through August 31, 1994, the NLRB's ordered remedy rests on an erroneous legal standard and constitutes an abuse of discretion. See Standard-Coosa, 691 F.2d at 1144. We therefore deny enforcement of the NLRB's remedial order. An appropriate remedy in this case must redress the companies' violations of the Act occurring between September 1, 1992, and May 6, 1993-- not between September 1, 1992, and August 31, 1994 as the NLRB ordered.

V.

For the foregoing reasons we grant in part and deny in part ITAC's and EMSI's petition for review, grant in part and deny in part the NLRB's cross-petition for enforcement, and remand this case to the NLRB for the entry of an appropriate remedial order, consistent with our holding that ITAC's obligations under the 1992-94 agreement ended on May 6, 1993.**3**

PETITION FOR REVIEW GRANTED IN PART
AND DENIED IN PART, PETITION FOR
ENFORCEMENT GRANTED IN PART AND DENIED
IN PART, AND REMANDED
_____

**3** ITAC also asserts that its due process rights have been violated because the caption of the case describes EMSI as an alter ego of ITAC, thereby conveying prejudgment of the alter ego issue. In responding to this argument below, the ALJ stated that ITAC "did not cite any legal authority in support of [its] contention that inclusion of an allegation of alter ego status in the caption of this case constituted a denial of due process. I have been unable to find any authoritative basis for that contention and therefore reject it." (J.A. at 503 n.68.) The NLRB, without discussion, adopted the ALJ's resolution of this issue.

Although our review of NLRB decisions is normally deferential, we review the Board's ruling on a constitutional issue de novo. See Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Corp., 65 F.3d 1113, 1123 (4th Cir. 1995); United States v. Presley, 52 F.3d 64, 67 (4th Cir. 1995). Like the ALJ, we have been unable to find any legal authority supporting ITAC's contention that an allegation of alter ego status in the caption of the case violates due process. Furthermore, we are convinced that ITAC received all of the process the company was due. Accordingly, we reject the company's contention that the NLRB's decision and order should be set aside and the complaint dismissed on due process grounds.

13